IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

CHRISTOPHER WILLIAM MANIKOWSKI,
      Petitioner,

vs.                          Case No.:  5:16cv161/WTH/EMT

SECRETARY DEPARTMENT OF
CORRECTIONS,
      Respondent.
_____/

## REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 19).  Petitioner filed a reply (ECF No. 30).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues raised by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the

opinion of the undersigned that the pleadings and attachments before the court show

that Petitioner is not entitled to relief.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established

by the state court record (*see* ECF No. 19).[1]  Petitioner was charged in the Circuit

Court in and for Bay County, Florida, Case No. 2007-CF-1364, with one count of

leaving the scene of an accident involving death (victim Harley Reed) (Count I), one

count of driving under the influence (DUI) manslaughter and failing to remain at the

scene and provide information and render aid (victim Harley Reed) (Count II), one

count of leaving the scene of an accident involving personal injury (victim Kory

McConnell) (Count III), one count of leaving the scene of an accident involving

damage (Count IV), and one count of driving under the influence with injury (victim

Kory McConnell) (Count V) (Ex. A at 19–20).  The case went to a jury trial on all

charges (Exs. H, I, J, K).  At the close of the State's case, the court granted a motion

for judgment of acquittal as to Count IV (*see* Ex. B at 215).  The jury found Petitioner

guilty as charged on the remaining counts (*id.* at 204–05).  At the sentencing hearing

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 19).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

on November 26, 2007, the State requested that the court set aside the verdict as to all Counts, except Count II, DUI manslaughter/failure to render aid (Ex. G).  The court adjudicated Petitioner guilty of only Count II, and sentenced him to twenty (20) years in prison, with pre-sentence jail credit of 71 days (*see* Ex. G, Ex. B at 214–18). Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D07-6162 (Ex. B at 223).

Prior to filing an initial brief, Petitioner filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (Ex. L at 527–30).  Petitioner argued that the written judgment indicated that Petitioner was adjudicated guilty of Counts I, II, III, and V, and convictions on Counts I, II, and III violated double jeopardy (*id.*).  The circuit court granted the 3.800(b)(2) motion, on the ground that the written judgment and sentence did not accurately reflect the oral pronouncement of sentence, because the court set aside the verdicts as to Counts I, III, and V at sentencing (*id.* at 554–55).  The court directed the clerk of court to amend the written judgment and sentence to accurately reflect that Petitioner was adjudicated guilty and sentenced only as to Count II (DUI manslaughter/failure to render aid) (*id.*). An amended judgment rendered on July 8, 2008 (*id.* at 556–60).

Petitioner filed an initial brief in the direct appeal (Ex. M).  The First DCA affirmed the judgment per curiam without written opinion on October 27, 2009, with the mandate issuing December 28, 2009 (Exs. O, Q).  <u>Manikowski v. State</u>, 23 So. 3d 113 (Fla. 1st DCA 2009) (Table).  Petitioner filed a petition for writ of certiorari in the United States Supreme Court, Case No. 09-9584 (Ex. R).  The Supreme Court denied the petition on May 17, 2010.  <u>Manikowski v. Florida</u>, 560 U.S. 910, 130 S. Ct. 3285, 176 L. Ed. 2d 1193 (2010) (Mem).

On August 16, 2010, Petitioner, through counsel, filed a motion for reduction of sentence, pursuant to Rule 3.800(c) of the Florida Rules of Criminal Procedure (Ex. S at 396–401).  The court held a hearing on the motion, with the same judge who presided at Petitioner's trial and sentencing (*see id.* at 614–15).  On October 19, 2010, the court denied the motion (*id.* at 615).

On May 6, 2011, Petitioner, through counsel, filed a motion for post-conviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. S). Petitioner twice amended the Rule 3.850 motion, with the second amended motion filed on October 10, 2012 (*see id.* at 728–50).  The state circuit court summarily denied six of Petitioner's nine claims, and set an evidentiary hearing on two claims (the remaining claim was a claim of "cumulative error") (*id.* at 779–93).  The

evidentiary hearing was held on October 1, 2014 (*id.* at 1462–1507). On November 4, 2014, the circuit court entered a final order denying the Rule 3.850 motion (*id.* at 1400–49). Petitioner appealed the decision to the First DCA, Case No. 1D14-5596 (Ex. U). The First DCA affirmed the decision per curiam without written opinion on March 31, 2016, with the mandate issuing June 1, 2016 (Exs. X, Y). Manikowski v. State, 190 So. 3d 637 (Fla. 1st DCA 2016) (Table).

Petitioner, through counsel, filed the instant federal habeas action on June 10, 2016 (ECF No. 1).

## II. STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Pub. L. 104-132, § 104, 110 Stat. 1214, 1218–19. Section 2254(d) provides, in relevant part:

> **(d)** An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > **(1)** resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>  **(2)**  resulted in a decision that was based on an unreasonable
>  determination of the facts in light of the evidence presented in the
>  State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ
> if the state court arrives at a conclusion opposite to that reached by this
> court on a question of law or if the state court decides a case differently
> than this Court has on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that principle to the
> facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the Williams framework, on any issue raised in a federal habeas

petition upon which there has been an adjudication on the merits in a state court

proceeding, the federal court must first ascertain the "clearly established Federal law,"

namely, "the governing legal principle or principles set forth by the Supreme Court

at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63,

71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established"

only when a Supreme Court holding at the time of the state court decision embodies

the legal principle at issue.  <u>Thaler v. Haynes</u>, 559 U.S. 43, 47, 130 S. Ct. 1171, 175

L. Ed. 2d 1003 (2010); <u>Woods v. Donald</u>, — U.S. —, 135 S. Ct. 1372, 1376, 191 L.

Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for

purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this

Court's decisions." (internal quotation marks and citation omitted)).

     After identifying the governing legal principle(s), the federal court determines

whether the state court adjudication is contrary to the clearly established Supreme

Court case law.  The adjudication is not contrary to Supreme Court precedent merely

because it fails to cite to that precedent.  Rather, the adjudication is "contrary" only

if either the reasoning or the result contradicts the relevant Supreme Court cases.

<u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002) ("Avoiding

th[e] pitfalls [of § 2254(d)(1)]  does not require citation to our cases—indeed, it does

not even require awareness of our cases, so long as neither the reasoning nor the result

of the state-court decision contradicts them.").  Where there is no Supreme Court

precedent on point, the state court's conclusion cannot be contrary to clearly

established federal law.  *See* <u>Woods</u>, 135 S. Ct. at 1377 (holding, as to claim that

counsel was per se ineffective in being absent from the courtroom for ten minutes

during testimony concerning other defendants:  "Because none of our cases confront

the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)).  If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See* Panetti v. Quarterman, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court.  Williams, 529 U.S. at 409; *see* Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam).  In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."   Harrington, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

Woods, 135 S. Ct. at 1376 (quoting Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* Gill v. Mecusker, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  Miller-El v. Cockrell, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a different conclusion in the first instance."  Brumfield v. Cain, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"). Neither the Supreme Court nor the Eleventh Circuit has interpreted how § 2254(d)(2) and § 2254(e)(1) interact in the context of fact-based challenges to state court adjudications. *See* <u>Cave v. Sec'y for Dep't of Corr.</u>, 638 F.3d. 739 (11th Cir. 2011). However, the Eleventh Circuit has declined to grant habeas relief under § 2254(d)(2) in the context of a state appellate court's summary affirmance, where it found that the validity of the state court decision was not premised on the trial court's unreasonable fact finding, and that the petitioner failed to demonstrate "by clear and convincing evidence that the record reflect[ed] an insufficient factual basis for affirming the state court's decision." <u>Gill</u>, 633 F.3d at 1292.

Only if the federal habeas court finds that the petitioner satisfied the AEDPA and § 2254(d), does the court take the final step of conducting an independent review

of the merits of the petitioner's claims.  *See* <u>Panetti</u>, 551 U.S. at 954.  Even then, the

writ will not issue unless the petitioner shows that he is in custody "in violation of the

Constitution or laws and treaties of the United States."  28 U.S.C. § 2254(a).  "If this

standard is difficult to meet, that is because it was meant to be."  <u>Richter</u>, 562 U.S. at

102.

　　Within this framework, the court will review Petitioner's claims.

III.　PETITIONER'S CLAIMS

　　A.　<u>Ground One:  "The state trial court erred by allowing Counts I–III to be
　　presented to the jury after the State conceded that convictions on them would
　　violate double jeopardy."</u>

　　Petitioner alleges that on the morning of trial, defense counsel moved to strike

Count II (DUI manslaughter/failure to render aid) and Count III (leaving the scene of

an accident involving injury) as violative of Petitioner's double jeopardy rights,

because Petitioner could not be charged with multiple counts of "leaving the scene of

an accident" (Counts I and III) and "failure to render aid" (Count II) involving the

same accident (ECF No. 1 at 22–29).  Petitioner alleges the State acknowledged that

a conviction under Counts I and II would violate double jeopardy.  However, the State

argued that dismissal on double jeopardy grounds was premature, because the jury

might find Petitioner guilty of any combination of the crimes charged, or their lesser

included offenses, that did not violate double jeopardy.  Petitioner alleges the trial

court agreed that the "leaving the scene of an accident" counts (Counts I and III)

violated double jeopardy, but the court refused to dismiss them, on the ground that

double jeopardy barred only the conviction, not the trial, on those counts.  Petitioner

alleges the jury was sworn and the amended information, including the multiplicitous

counts, was read to the jury.  Petitioner alleges the jury found him guilty of Counts I,

II, III, and V (i.e., both of the "leaving the scene of an accident" counts (Counts I and

III), the DUI manslaughter/failure to render aid count (Count II), and the DUI with

injury count (Count V)).  Petitioner acknowledges that the trial court orally set aside

the verdicts as to Counts I, III, and V, and adjudicated Petitioner guilty and sentenced

him only on Count II (DUI manslaughter/failure to render aid).

Petitioner contends the trial court's submitting Counts I–III to the jury violated

the Double Jeopardy Clause.  He argues that the constitutional prohibition against

multiple punishments for the same offense bars simultaneous prosecutions as well as

successive prosecutions.  Relying upon the reasoning of the Florida Supreme Court

in Crossley v. State, 596 So. 2d 447, 450 (Fla. 1992), Petitioner contends the trial

court's allowing all counts to be presented to the jury prejudiced him, because the

existence of one count may have improperly bolstered another:

> The danger . . . lies in the fact that evidence relating to each of the crimes may have the effect of bolstering the proof of the other.  While the testimony in one case standing alone may be insufficient to convince a jury of the defendant's guilt, *evidence that the defendant may also have committed another crime can have the effect of tipping the scales*.

(*see* ECF No. 30 at 2–3 (quoting <u>Crossley</u>, 596 So. 2d at 450 (emphasis added by Petitioner)).

Respondent concedes Petitioner presented this claim on direct appeal (ECF No. 19 at 16).  Respondent contends no clearly established federal law establishes that <u>charging</u> multiple offenses based upon the same conduct—as opposed to being convicted of them—violates the Double Jeopardy Clause (*id.* at 16–19).

      1.    Clearly Established Federal Law

The Double Jeopardy Clause embodies three separate guarantees:  "It protects against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and against multiple punishments for the same offense."  <u>North Carolina v. Pearce</u>, 395 U.S. 711, 717, 89 S. Ct. 2072, 23 L. Ed. 2d 656 (1969), *overruled other grounds by*, <u>Alabama v. Smith</u>, 490 U.S. 794, 108 S. Ct. 2201, 104 L. Ed. 2d 865 (1989).  "While the Double Jeopardy Clause may protect a defendant against cumulative punishments for convictions on the same offense, the Clause does not prohibit the State from prosecuting [a defendant] for such

multiple offenses in a single prosecution." Ohio v. Johnson, 467 U.S. 493, 499–500, 104 S. Ct. 2536, 81 L. Ed. 2d 425 (1984).

2.    Federal Review of State Court Decision

Petitioner presented Ground One on direct appeal (Ex. M at 24–32). The First DCA affirmed the judgment without written opinion (Ex. O). Petitioner sought certiorari review in the United States Supreme Court (Ex. R). Petitioner argued that to the extent the First DCA's decision was supported by Ohio v. Johnson, 467 U.S. 493 (1984), the Supreme Court should "reevaluate its holding in Johnson" (id. at 8 n.13). The Court denied the petition for review. Manikowski v. Florida, 560 U.S. 910 (2010).

Petitioner cites several Supreme Court opinions in support of his double jeopardy claim. For example, he cites Witte v. United States, 515 U.S. 389, 115 S. Ct. 2199, 132 L. Ed. 2d 351 (1995), which involved a defendant's double jeopardy claim that when a sentencing court considered as yet uncharged crimes involving cocaine importation, in order to impose a higher sentence upon his conviction of marijuana charges, he could no longer be prosecuted for the cocaine crimes. 515 U.S. at 394–95. The Supreme Court held that the sentencing court's consideration of uncharged but related cocaine importation conduct, in order to impose a higher sentence within the

statutorily authorized range for the marijuana charges of which the defendant was convicted, did not impose "punishment" for the cocaine conduct for double jeopardy purposes and, thus, did not bar a subsequent prosecution on the cocaine charges.  515 U.S. at 401.

Petitioner also cites <u>Justices of Boston Mun. Court v. Lydon</u>, 466 U.S. 294, 104 S. Ct. 1805, 80 L. Ed. 2d 311 (1984).  The defendant in that case was tried at a "first-tier bench trial" for possession of tools designed to break into a car in order to steal property inside the car.  466 U.S. at 297.  The trial judge rejected Lyndon's argument that the State had introduced no evidence of intent, and sentenced Lyndon to two years in jail.  *Id.*  Lyndon requested a trial de novo by a jury and was released on personal recognizance.  *Id.*  Before the jury trial commenced, Lyndon moved to dismiss the charge on the ground that no evidence of intent had been presented at the bench trial, and argued that the Double Jeopardy Clause barred a second trial.  *Id.* at 298.  The Supreme Court rejected Lyndon's double jeopardy claim as follows:

> We note at the outset that Lydon was in "jeopardy" in only a theoretical sense.  Although technically "jeopardy" under the Double Jeopardy Clause entails the potential or risk of trial and conviction, not punishment, it is worthy of note that virtually nothing can happen to a defendant at a first-tier trial that he cannot avoid.  He has an absolute right to obtain the de novo [jury] trial, and he need not allege error at the first-tier trial to do so.  Once the right to a de novo trial is exercised, the judgment at the bench trial is "wiped out."

466 U.S. at 310 (internal quotation marks and citations omitted).

Petitioner also relies upon Illinois v. Vitale, 447 U.S. 410, 100 S. Ct. 2260, 65 L. Ed. 2d 228 (1980) for the principle that double jeopardy bars simultaneous as well as successive prosecutions. Defendant Vitale struck two children while driving a car. 466 U.S. at 411. One of the children died almost immediately; and the other died the following day. Vitale was charged with failing to reduce speed and, after a trial without a jury, he was convicted and sentence to pay a fine of $15. *Id.* at 412. The day after the trial, the State charged Vitale with two counts of involuntary manslaughter. *Id.* Vitale sought dismissal of the charges on double jeopardy grounds. *Id.* at 413. The trial court granted the motion to dismiss, on the ground that the manslaughter prosecution was barred by a state statute requiring that all offenses based on the same conduct be prosecuted in a single prosecution. *Id.* at 413–14. The state supreme court did not reach the state statutory question and instead affirmed the dismissal of the manslaughter charges on double jeopardy grounds. *Id.* at 414–15.

The State sought review in the United States Supreme Court. The Court opined that if, as a matter of state law, a careless failure to reduce speed is always a necessary element of manslaughter by automobile, then the two offenses were the "same" for double jeopardy purposes, and Vitale's trial on the latter charge would constitute

double jeopardy. *Id.* at 419–20. The Court further opined that if, in the pending manslaughter prosecution, the State relied upon and proved a failure to reduce speed as the reckless act necessary to prove manslaughter, Vitale would "have a substantial claim of double jeopardy." *Id.* at 421. But because of the Court's doubts about the relationship under state law between the crimes of manslaughter and a careless failure to reduce speed, and because the reckless act or acts the State would rely upon to prove manslaughter were still unknown, the Court remanded the case to the state supreme court for further proceedings. *Id.*

Petitioner additionally relies upon lower federal court decisions, but as Respondent correctly argues, those decision do not constitute "clearly established federal law" for purposes of § 2254(d)(1). Further, none of the Supreme Court cases cited by Petitioner holds that the Double Jeopardy Clause is violated when, as here, a defendant is charged in a single prosecution with three criminal counts arising out of the same accident, but the defendant is adjudicated guilty and sentenced on only one count. Petitioner has not demonstrated that the state court's adjudication of his double jeopardy claim was based upon an unreasonable factual determination. Nor has Petitioner demonstrated that the state court's rejection of his claim was contrary

to or an unreasonable application of <u>Johnson</u> or any other clearly established federal law.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

      B.    <u>Ground Two:  "The state trial court erred by failing to admit evidence of Mr. Reed's intoxication."</u>

Petitioner alleges a toxicology report of Mr. Reed, the victim of the DUI manslaughter charge, showed that alcohol and methamphetamine were present in his system at the time he was struck by Petitioner's vehicle (ECF No. 1 at 29–32). Petitioner alleges the State filed a motion in limine seeking to exclude the toxicology results, and Petitioner's counsel opposed the motion on the ground that it was relevant to causation.  Petitioner alleges the trial court granted the State's motion in limine. Petitioner alleges during the State's case-in-chief, defense counsel again requested admission of the toxicology report, but the trial court reiterated its previous ruling.

Petitioner contends one of the elements of the DUI manslaughter charge was that he caused or contributed to the cause of death of Mr. Reed.  Petitioner contends Mr. Reed's intoxication was directly related to Petitioner's primary theory of defense, i.e., that Mr. Reed had stepped out in front of Petitioner's vehicle.  Petitioner contends the trial court's exclusion of the toxicology results impaired his right to present a defense, in violation of the Due Process Clause. He cites <u>Chambers v. Mississippi</u>, 410 U.S. 284, 302 (1973) as the relevant clearly established federal law.

Respondent asserts Petitioner presented a similar issue in state court (ECF No. 19 at 19). Respondent contends Mr. Reed's state of intoxication or impairment was wholly immaterial in light of the fact that the sole defense presented at trial was that Petitioner was not driving the car when it struck and killed Mr. Reed (*id.*). Respondent further contends that even without the toxicology results, defense counsel could have made a good faith argument to the jury that Mr. Reed stumbled into the path of Petitioner's vehicle, based upon the testimony of Mr. McConnell (the victim of Counts III and V), that he had been drinking that night and that he and Mr. Reed were crossing the road together when they were struck. Respondent additionally contends Petitioner was not prejudiced by the trial court's exclusion of the toxicology report, because the jury also found Petitioner guilty of leaving the scene of an accident involving death, which would subject Petitioner to the same sentence as DUI manslaughter/failure to render aid, because they were both first degree felonies.

        1.     Clearly Established Federal Law

In <u>Nevada v. Jackson</u>, 569 U.S. 505, 133 S. Ct. 1990, 186 L. Ed. 2d 62 (2013), the United States Supreme Court said:

> "[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense,'" <u>Crane v. Kentucky</u>, 476 U.S. 683, 690, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986) (quoting <u>California v. Trombetta</u>, 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed.

2d 413 (1984)), but we have also recognized that "'state and federal
rulemakers have broad latitude under the Constitution to establish rules
excluding evidence from criminal trials,'"  Holmes v. South Carolina,
547 U.S. 319, 324, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006) (quoting
United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L.
Ed.2 d 413 (1998)).  Only rarely have we held that the right to present a
complete defense was violated by the exclusion of defense evidence
under a state rule of evidence.  *See* 547 U.S. at 331, 126 S. Ct. 1727 (rule
did not rationally serve any discernible purpose); Rock v. Arkansas, 483
U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987) (rule arbitrary);
Chambers v. Mississippi, 410 U.S. 284, 302–303, 93 S. Ct. 1038, 35 L.
Ed. 2d 297 (1973) (State did not even attempt to explain the reason for
its rule); Washington v. Texas, 388 U.S. 14, 22, 87 S. Ct. 1920, 18 L. Ed.
2d 1019 (1967) (rule could not be rationally defended).

*Id.* at 509.

In Chambers, the Supreme Court held that the exclusion of hearsay statements

critical to the defendant's defense and that "bore persuasive assurances of

trustworthiness" violated the defendant's Fourteenth Amendment right to due process.

410 U.S. at 302.  The hearsay statements at issue in Chambers were a another person's

out-of-court confessions to the crime with which the defendant was charged.  *Id.* at

300.

### 2.    Federal Review of State Court Decision

Petitioner presented this due process claim on direct appeal (Ex. M at 36–40).

The First DCA affirmed the judgment without written opinion (Ex. O).

The state court record shows that on October 10, 2007, one week prior to
Petitioner's trial, the State filed a motion in limine seeking to exclude evidence of Mr.
Reed's toxicology results (Ex. A at 67–68).  The trial court heard the State's motion
on October 15, 2007, just prior to jury selection (Ex. E at 45–51).  Defense counsel
argued:

> Your Honor, as you know, one of the main elements in the
> DUI/Manslaughter is causation.  There's been testimony, I think, already
> elicited from some of the officers that the victim was actually in the
> middle of the roadway, and we feel that his blood results, which
> contained alcohol and I think, methamphetamine, should be able to be
> cross examined by myself and Ms. Anderson when it comes to the
> medical examiner as to what was in his system because again, it goes to
> the causation element, and that's, that's the whole crux of the case there.

(Ex. E at 46).  The State argued that the victim's toxicology results were relevant only
if the victim's conduct was the sole proximate cause of the accident, and the evidence
would show that such was not the case—that the pedestrian victims were in view in
time for Petitioner to avoid hitting them (Ex. E at 46–47).  Defense counsel responded
that defense witnesses could possibly testify that Mr. Reed's impairment/intoxication
was the sole proximate cause (*id.* at 49).  The State responded that they had no
problem with the defense arguing that the location of the victims in the roadway was
relevant to the causation issue, but the toxicology report was not relevant (*id.* at
49–50).

The trial court ruled as follows:

> [A]t this point in time, I agree with the State, there are ways to get around, or ways to argue the position about, as indicated by the State, where the victim was located without reference to a toxicology report, and that's what we're talking is the results of the toxicology report. And at this time, the Court will reserve ruling on the motion. The reason I do that is, if it becomes something that becomes relevant, then the defense can certainly bring that to the Court's attention, and maybe for the record, I should deny the, or should grant the motion with leave for the defense to raise it when the toxicology report wishes to come in.

(Ex. E at 50).

Prior to the testimony of the medical examiner, Dr. Charles Siebert, defense counsel requested permission to cross-examine Dr. Siebert regarding Mr. Reed's toxicology results (Ex. K at 338). The State responded that the defense had cross-examined the witnesses regarding the victims' physical positions in the roadway, and thus had the opportunity to present the lack-of-causation defense (*id.* at 338–39). The State argued that evidence of Mr. Reed's impairment/intoxication would only be relevant if there was evidence that his conduct was the sole proximate cause of the accident, and the evidence adduced so far showed that was not the case (*id.* at 339). The court ruled as follows:

> At this point my understanding is that the defense is that the defendant wasn't, maybe not operating the vehicle and if not operating the vehicle, somebody else was operating the vehicle. And—but if he was operating the vehicle then it wasn't his fault, I guess. But in light of the state of the

> evidence at this point in time the court will deny the defendant's— or grant the state's motion in limine to prevent the testimony of the victim's blood alcohol [and presence of drugs] from coming into evidence at this point in time.

(Ex. E at 339–41). There was no proffer of the actual results of Mr. Reed's toxicology test.

Although Florida's DUI manslaughter statute includes the element of causation, it does not require the State to prove that the defendant's conduct was the <u>sole</u> cause of the victim's death. *See* <u>State v. Hubbard</u>, 751 So. 2d 552, 564 (Fla. 1999) (emphasis added). In a vehicular homicide prosecution, evidence of the conduct of the decedent is relevant only if the conduct was the <u>sole proximate cause</u> of the accident that caused the decedent's death. *See* <u>Filmon v. State</u>, 336 So. 2d 586, 591 (Fla. 1976) (emphasis added); <u>Keller v. State</u>, 849 So. 2d 385, 387 (Fla. 2d DCA 2003) ("In a vehicular homicide prosecution, evidence of a victim's negligence is relevant only if the victim's act was the sole proximate cause of the accident that caused the victim's death."); <u>Union v. State</u>, 642 So. 2d 91, 91 (Fla. 1st DCA 1994) ("Unless it can be said that the decedent's conduct was the sole proximate cause of the homicide, or unless there is some reason why it would be unjust or unfair to impose criminal liability, the decedent's conduct does not supersede the defendant's conduct as the proximate cause of the homicide. Therefore, in the present case, the failure of

the decedents to wear seat belts was not a defense, and the court did not err in granting

the motion in limine or in instructing the jury."); <u>Brimmer v. State</u>, 541 So. 2d 1307,

1308 (Fla. 4th DCA 1989) (finding no error in trial court's refusal to instruct the jury

that the decedent could have been the sole cause of the accident where there was "no

reasonable view of the evidence upon which a jury could conclude that the victim's

act of failing to yield the right of way was the sole proximate cause of the accident").

In Petitioner's trial, the jury heard evidence that the victims' conduct may have

caused the accident. Kory McConnell, the surviving victim, testified that he was with

Mr. Reed on the night of the accident (Ex. I at 138–52). Mr. McConnell testified that

he and Mr. Reed went to a condominium from approximately 10:00 p.m. to midnight,

and then walked to a bar. McConnell testified that he drank six or seven beers that

night. McConnell testified that he and Mr. Reed left the bar and started walking

across the street. He testified that he looked for cars prior to crossing the street, but

saw none coming. Mr. McConnell testified that as he and Mr. Reed began crossing,

he heard the gunning of a car engine and turned and saw headlights. McConnell

testified that he was walking behind Mr. Reed, and as he heard the revving engine, he

grabbed Reed and tried to push him toward the other side of the road, but as soon as

he touched Reed, "we was [sic] already hit and flying through the air." Mr.

McConnell testified that he landed on his back, and then Mr. Reed landed face down three feet away.  Mr. McConnell testified that Mr. Reed's face was bloody, and he had no pulse.  McConnell testified that the driver of the car never stopped and, "pretty much left me for dead like a dog on the side of the road."  Mr. McConnell admitted that he and Mr. Reed were in the middle of one of the traveling lanes of traffic when they were struck.

Fair-minded jurists could disagree as to the correctness of the state court's conclusion that Mr. Reed's toxicology results were not critical to the defense, and therefore exclusion of the results did not deprive Petitioner of due process.  But it is this potential for disagreement which precludes a federal habeas court from granting relief.  *See* Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at minimum, fair-minded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief.).  Therefore, Petitioner is not entitled to relief on Ground Two.

C.    Ground Three:  "The state trial court erred by refusing to suppress evidence of Petitioner Manikowski's blood alcohol level as there was no probable cause for the blood draw."

Petitioner claims that the trial court erred by denying defense counsel's motion to suppress evidence of Petitioner's blood-alcohol level, on the ground that law enforcement lacked probable cause to believe that Petitioner was the driver of the vehicle that struck Mr. Reed and Mr. McConnell, or that Petitioner caused the death and injuries to the victims (ECF No. 1 at 32–38).  Petitioner alleges that in ruling on the defense's motion to suppress, the trial court relied in part on Petitioner's statements to Mark Graham, an assistant state attorney who investigated the case, which were obtained without Graham's having advised Petitioner of his <u>Miranda</u> rights.

Respondent asserts Petitioner raised a similar issue at trial and on direct appeal (ECF No. 19 at 20).  Respondent contends this claim is not cognizable on federal habeas, pursuant to <u>Stone v. Powell</u>, 428 U.S. 465, 96 S. Ct. 3037 (1976), because Petitioner received a full and fair hearing on the suppression issue in state court. Respondent additionally contends there was sufficient probable cause to believe that Petitioner was the driver and that his driving caused Mr. Reed's death.  Therefore, state court's adjudication of the claim was not contrary to or an unreasonable application of clearly established federal law.

In Petitioner's reply, he did not address Respondent's <u>Stone v. Powell</u> argument (*see* ECF No. 30 at 3).

The <u>Stone v. Powell</u> doctrine provides: "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 494, 96 S. Ct. 3037, 49 L.Ed. 2d 1067 (1976) (footnotes omitted). The <u>Stone</u> Court found that, in the habeas context, "the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." 428 U.S. at 494–95 (footnote omitted). "'For a claim to be fully and fairly considered by the state courts, where there are facts in dispute, full and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by a higher state court.'" <u>Mincey v. Head</u>, 206 F.3d 1106, 1126 (11th Cir. 2000) (quoting <u>Tukes v. Dugger</u>, 911 F.2d 508, 513–14 (11th Cir. 1990), in turn quoting <u>Morgan v. Estelle</u>, 588 F.2d 934, 941 (5th Cir. 1979)).

Here, Petitioner has not presented a Fourth Amendment claim with respect to the suppression issue; instead, he argues only that the state court misapplied state law,

specifically, Florida Statutes § 316.1933 and cases interpreting and applying that statute. Likewise, Petitioner made only state-law-based arguments in the suppression proceedings in the trial court and in his initial brief on appeal to the First DCA. Because Petitioner does not allege a Fourth Amendment violation in his § 2254 petition with respect to the suppression issue, and because federal habeas relief is available to correct only constitutional injury, *see* 28 U.S.C. § 2254(a); <u>Wainwright v. Goode</u>, 464 U.S. 78, 104 S. Ct. 378, 78 L. Ed. 2d 187 (1983); <u>Engle v. Isaac</u>, 456 U.S. 107, 102 S. Ct. 2976, 73 L. Ed. 2d 1361 (1981); <u>Carrizales v. Wainwright</u>, 699 F.2d 1053 (11th Cir. 1983), Petitioner's challenge to the state court's denial of the motion to suppress does not state a basis for federal habeas relief.

Even if Petitioner asserted, both in state court and this federal proceeding, a Fourth Amendment claim with respect to the trial court's ruling on the motion to suppress, the federal court's consideration of the Fourth Amendment claim is foreclosed by <u>Stone v. Powell</u>, because the state court record demonstrates that Petitioner received full and fair consideration of the issue in state court.

Prior to Petitioner's trial, defense counsel sought suppression of the results of Petitioner's blood test on the ground that his blood sample was collected in violation of Florida Statutes § 316.1933 (*see* Ex. A at 56–57). The trial court held an

evidentiary hearing on October 12 and 15, 2017 (Exs. D, E). The State presented testimony from law enforcement officers who facilitated the blood draw, pursuant to § 316.1933. In support of the State's position that the officers had probable cause for the blood draw, which is a requirement of § 316.1933, the State presented testimony of Mark Graham regarding a recorded statement he took from Petitioner prior to Petitioner's being advised of his <u>Miranda</u> rights (*see* Ex. E; *see also* ECF No. 30, Ex. A). Defense counsel objected to the admission of evidence of Petitioner's statements at the suppression hearing, on <u>Miranda</u> grounds. The trial court overruled the objection. During defense counsel's argument on the suppression issue, counsel again argued that Petitioner's statements to Graham should not be considered, because they were made in violation of <u>Miranda</u>. At the conclusion of the suppression hearing, the court orally ruled that, based upon the evidence presented at the hearing, there was probable cause to believe that a motor vehicle caused the victim's death, that Petitioner was the driver of the vehicle at the time of the accident, and that Petitioner was under the influence of alcohol or a controlled substance at the time of the accident (*see* Ex. E at 43). Addressing defense counsel's <u>Miranda</u> argument, the trial court ruled that the defense could seek suppression of Petitioner's statements to Graham at

trial if the State intended to offer those statements (*id.* at 44).[2]  Following the suppression hearing, the trial court issued a written order, which included its factual findings and legal conclusions (Ex. A at 93–96).  In the written order, the court referenced the evidence presented at the suppression hearing, including the officers' testimony regarding the information they collected from witnesses, the officers' observations of the scene of the accident, and their observations of the scene where they located Petitioner and his vehicle.  The trial court also referenced Petitioner's admission to Graham, that he was driving the vehicle at the time of the accident but that no pedestrians were involved.  The court made findings of fact about whether the officers had probable cause to require the blood draw.

Petitioner presented the suppression issue on direct appeal and argued that Petitioner's statements should have been excluded from the suppression hearing (Ex. M at 43–44). The State responded that even if the trial court improperly considered Petitioner's statements, the error was harmless, because the officers had probable cause for the blood draw without Petitioner's statements (*see* Ex. N at 42 n.7).  The state appellate court affirmed the judgment (Ex. O).

---

[2] The State did not offer Petitioner's statements at trial.

Upon review of the evidence adduced at the suppression hearing (*see* Exs. D, E), and the trial court's explicit factual findings, it is clear that Petitioner's statements to Graham were not essential to the court's determination that the officers had probable cause to require the blood draw. Therefore, any improper consideration of Petitioner's statements to Graham did not deprive Petitioner of "full and fair" consideration of the suppression issue in state court. Under <u>Stone v. Powell</u>, this federal court is precluded from considering a Fourth Amendment claim regarding admission of the blood draw evidence.

Neither Petitioner's state-law based challenge, nor a Fourth Amendment challenge, to admission of the blood draw evidence provides a cognizable basis for federal habeas relief. Therefore, Ground Three should be denied.

D.    <u>Ground Four: "Defense counsel rendered ineffective assistance of counsel by misadvising Petitioner Manikowski that if he testified at trial, his pretrial statements could be used by the State to impeach him."</u>

Petitioner alleges defense counsel, Attorney Ben Bollinger, testified at the post-conviction evidentiary hearing that he told Petitioner that if he testified at trial, his pretrial statements could be used for impeachment (ECF No. 1 at 38–44). Petitioner alleges this advice was erroneous, because Florida law permits such use only if the statements were first shown to be voluntary. Petitioner alleges his statements to Mark

Graham were not voluntary due to Petitioner's intoxication.  Petitioner alleges his

decision not to testify was based upon Attorney Bollinger's erroneous legal advice.

Petitioner alleges he was prejudiced by Bollinger's erroneous advice, because if he

had testified, he would have testified that he remembered getting in the passenger side

of his vehicle.  Petitioner contends the result of his trial would have been different if

the jury had heard this testimony.

Respondent contends Petitioner presented the "bare bones" of this claim in state

court, but failed to fairly present the state court with the argument he makes here (ECF

No. 19 at 22–23).  Respondent contends Petitioner did not present the issue of the

voluntariness of his statements (due to his intoxication) in his post-conviction motion,

nor did Petitioner question Attorney Bollinger at the evidentiary hearing about

Bollinger's knowledge of this issue.  Respondent contends Petitioner first presented

the voluntariness argument in his written closing argument after the evidentiary

hearing.  Respondent contends Petitioner thus failed to satisfy the exhaustion

requirement as to this claim.

Respondent additionally contends Petitioner is not entitled to federal habeas

relief even if this court considered his claim (ECF No. 19 at 23–26).  Respondent

contends Petitioner failed to show that his statements would have been deemed

involuntary due to intoxication; therefore, Attorney Bollinger's advice was not deficient.  Respondent further argues the state court reasonably rejected Petitioner's claim that he was prejudiced by Bollinger's alleged deficiency, because Petitioner vacillated when asked whether he would have testified but for the alleged deficiency, and there is no reasonable probability Petitioner would have been acquitted if he had testified.

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  Id. at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  Id. at 697.

The focus of inquiry under the performance prong of Strickland is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms.  Strickland, 466 U.S. at 688–89, 691.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir.

2006) (citing <u>Chandler v. United States</u>, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." <u>Strickland</u>, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." <u>Michael v. Crosby</u>, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting <u>Chandler</u>, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do.'" <u>Jones</u>, 436 F.3d at 1293 (citing <u>Chandler</u>, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable

lawyer, in the circumstances, would have done so." <u>Rogers v. Zant</u>, 13 F.3d 384, 386 (11th Cir. 1994).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Jones v. GDCP Warden</u>, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting <u>Strickland</u>, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. <u>Williamson v. Fla. Dep't of Corr.</u>, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing <u>Richter</u>, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Strickland</u>, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at

694–95.  Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal.  *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact.  <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).  "Surmounting <u>Strickland</u>'s high bar is never an easy task."  <u>Padilla v. Kentucky</u>, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010).  "Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult."  <u>Richter</u>, 131 S. Ct. at 788.  As the <u>Richter</u> Court explained:

> The standards created by <u>Strickland</u> and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.

*Id.* (citations omitted).

>    2.    Federal Review of State Court Decision

Petitioner presented this ineffective assistance of trial counsel ("IATC") claim

as Ground 4 of his Second Amended Rule 3.850 motion (Ex. S at 6).  The state circuit

court held an evidentiary hearing on the claim (Ex. S at 1403–49).  The court

adjudicated the claim as follows:

> The Defendant's trial counsel was limited in his time to prepare
> for the jury trial in this case.  One of the defense's key witnesses was the
> driver of the taxi cab that the Defendant hit after hitting the two victims.
> She testified that she saw the driver of the Defendant's vehicle in the
> rearview mirror and she was certain it was not the Defendant.  Because
> that witness was leaving the county, the Defendant exercised his right to
> a speedy trial.  The record reflects that the Defendant was aware when
> he asked his counsel to file a Notice of Expiration of Speedy Trial that
> formal discovery had not been started or completed.    It was the
> Defendant's decision to proceed to trial with limited time to prepare.
>
> In Ground 4, the Defendant claimed that if his trial counsel had
> not misadvised him that he should not testify, he would have been able
> to bolster the taxicab driver's testimony and refute the testimony of the
> State's key witness, Mark Borelli, who was a passenger in the
> Defendant's vehicle at the time of the offense.  The record reflects that
> the Defendant made an informed decision not to testify.  Mr. Bollinger's
> trial strategy was to argue that the Defendant wasn't driving, and that
> was a reasonable trial strategy in this case.  His advice to the Defendant
> that he not testify was also very reasonable.  The Defendant gave a
> damaging statement on the night of the incident in which he admitted to
> driving his vehicle and denied drinking.  Mr. Bollinger was successful
> in suppressing the statement prior to trial, but there was a possibility that
> the Defendant could be impeached with that statement if he testified.

> This concern was not the only reason Mr. Bollinger advised the
> Defendant not to testify.  Further, the Defendant has failed to establish
> prejudice in support of this ground.  At the evidentiary hearing, the
> Defendant could only state that he "probably" would have testified if he
> had been told that the statement he gave could not be used against him.
> If he had testified at trial consistent with his statements at the evidentiary
> hearing, the State would have been well able to discredit him with the
> weaknesses in his own testimony and with other evidence presented at
> trial.

(Ex. S at 1401).  The First DCA affirmed the decision without written opinion (Ex. X).

The state court reasonably rejected Petitioner's claim on the prejudice prong of

the Strickland standard.   At the post-conviction evidentiary hearing, Petitioner

testified regarding the substance of his proposed trial testimony (Ex. S at 1429–35).

Petitioner stated that he would have testified that he and his friends had a custom of

taking one another's car keys when the owner of the car drank too much.  Petitioner

testified that on the night of the accident, he was "pretty intoxicated," so his friend

Angie took his car keys.  Petitioner testified he remembered approaching his car in a

parking lot from the rear and getting in.  Petitioner testified he remembered that his

car was on his left, and he opened the door and slid in.  Petitioner testified there was

no question in his mind that he got in on the passenger side.  Petitioner testified he did

not recall any accident, and the next thing he remembered was being in the car and

looking up to see that the windshield was shattered.  Petitioner testified that he "had

to have been on the passenger side," because there was no steering wheel in front of him.  Petitioner testified that his next memory was of pushing on the front of the car in an attempt to get the car unstuck from the sand.  Petitioner testified that his next memory was "freaking out" at the hospital when a nurse attempted to draw blood. Petitioner testified he did not remember ever driving the car; nor did he remember anything about making a statement to an investigator.

Petitioner testified as follows with respect to Attorney Bollinger's advice regarding whether to testify at trial, specifically, the State's ability to use Petitioner's statement to the investigator:

> Q [by Petitioner's counsel]  Did he [Attorney Bollinger], in fact, tell you his legal advice was that that statement would be used to impeach you if you took the stand?
>
> A.  Yes, sir.
>
> Q.  Did you base your decision on whether or not to testify on that legal advice?
>
> A.  Yes, sir.

(Ex. S at 1435).

On cross-examination, the State questioned Petitioner about the risks of his testifying (Ex. S at 1438–42).  Petitioner acknowledged that there were "a lot of gaps"

in his memory on the night of the accident, and those gaps included critical parts of

the case:

> Q.  So there are huge gaps and they are gaps that include pretty critical parts of this case, correct?

> A.  Yes, sir.

> Q.  Like when the person was hit?

> A.  Yes, sir.

> Q.  Who was driving?

> A.  Yes, sir.

> Q.  And certainly a jury could think that they are very convenient lapses in memory, couldn't they?

> A.  Yes, sir.

> Q.  And in fact, because of those lapses in memory we don't know if you got out of the car and then back into the car, correct?

> A.  Correct, sir.

> Q.  We don't know if you were driving the car when you hit the person?

> A.  Correct.

> Q.  We just know that your next memory is I was at some point sitting in the passenger seat and there was the crack in front of me?

> A.  Yes, sir.



Q. So all of those things could have been brought out in cross examination, correct?

A. Yes, sir.

Q. Regardless of whether or not the statement was even used you could have been subject to that kind of attack on cross examination?

A. Yes, sir.

. . . .

Q. So at the end of the day your defense would have been the same, correct, that somebody else was driving?

A. Yes, sir.

Q. And the only thing that you could testify to were all these gaps in your memory that night, correct?

A. Yes, sir.

. . . .

Q. So in evaluating a risk/reward analysis there still would be a risk versus reward in testifying, wouldn't it?

A. Yes, sir.

Q. And on that day there was a risk/reward analysis that you guys went through, correct?

A. Yes, sir.

Q. And you decided in front of this court not to testify, correct?

A. Yes, sir.

(Ex. S at 1439–42).

On redirect, Petitioner was less certain as to whether he would have testified even if he had known that the State could not necessarily use his statements to Mark Graham:

> Q [by Petitioner's counsel].  Mr. Manikowski, given everything Mr. Pell just said, the risk analysis in this case, if you had been told that the statement that you gave that you didn't remember could not be used against you would you testify?
>
> A.  I probably would have.  I wanted to.
>
> Q.  But did you base your decision on the legal advice concerning, to testify, the risk analysis Mr. Pell is talking about, but was your decision based on the legal advice that was given to you about the statement being introduced and used against you if you testified?
>
> A.   Yes, sir, I took Ben's [Bollinger] advice seriously.   I considered everything he said.
>
> Q.  Had you been advised that the statement could not be used against you would you have testified?
>
> A.  I probably would have.

(Ex. S at 1442–43).

Given Petitioner's lack of certainty as to whether he would have testified, and given the gaps in Petitioner's memory at critical times on the night of the accident, the state court reasonably determined that Petitioner failed to show a reasonable probability that the outcome of trial would have been different if Attorney Bollinger

had told Petitioner that the there was a possibility the State would not be able to use

Petitioner's statement to Investigator Graham as impeachment.

Petitioner failed to show that the state court's rejection of his IATC claim was

based upon an unreasonable determination of the facts, or that it was contrary to or an

unreasonable application of Strickland.  Therefore, he is not entitled to federal habeas

relief on Ground Four.

E.    Ground Five:  "Defense counsel rendered ineffective assistance of counsel by failing to properly impeach Kory McConnell."

Petitioner alleges Kory McConnell, the victim who survived the accident, had

several felony convictions (ECF No. 1 at 44–45).  Petitioner contends Attorney

Bollinger was ineffective for failing to impeach McConnell with the prior convictions.

Respondent asserts Petitioner presented a similar issue in state court (ECF No.

19 at 26).  Respondent contends the state court's adjudication of the claim was not

contrary to or a misapplication of clearly established federal law, and was not

unreasonable in light of the facts adduced in state court (*id.* at 26–27).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 8 of his Second Amended Rule 3.850

motion (Ex. S at 746–47). The state circuit court adjudicated the claim as follows:

> In Ground 8, the Defendant claimed his trial counsel should have
> impeached Kory McConnell with his prior felony convictions. Again,
> Mr. Bollinger had limited time to prepare for trial. He testified that the
> convictions were from out of state and he was uncertain if he could get
> certified copies in time for the trial. More importantly, it would have
> been a poor tactical decision to confront Kory McConell with his
> criminal record because Mr. McConnell was a victim who sustained
> significant injuries when he was hit by the Defendant's car, and his
> friend was killed by the impact. Further, the Defendant failed to
> establish prejudice resulting from Mr. Bollinger's decision not to
> impeach Mr. McConnell because Mr. McConnell could not identify the
> vehicle or the driver of the vehicle, and Mr. McConnell admitted that he
> and the other victim were in the street when they were hit. That
> testimony supported the defense theory that the Defendant was not
> driving the vehicle when it hit the victims.

(Ex. S at 1401). The First DCA affirmed the decision without written opinion (Ex. X).

As previously noted, Kory McConnell was one of the pedestrians hit by

Petitioner's car. Mr. McConnell testified, in substance, that he was walking with Mr.

Reed (the other victim, who was killed in the accident) on the night of the accident;

that he and Mr. Reed were in one of the traveling lanes of traffic when they were

struck; and that he (McConnell) had been drinking that night (*see* Ex. I at 138–51).

At the post-conviction evidentiary hearing, Attorney Bollinger testified that he

was aware that Mr. McConnell had two prior felonies from the State of Tennessee

(Ex. S at 1409–13). Bollinger testified that he did not attempt to impeach Mr. McConnell's testimony with the prior felonies, for two reasons. First, the star defense witness was planning to leave the country soon, so he and Petitioner decided to move the case to trial quickly by filing a demand for speedy trial (*id.*). Attorney Bollinger testified that he did not have sufficient time to obtain certified copies of the Tennessee convictions by the time of trial.

Attorney Bollinger testified that his second reason for not impeaching Mr. McConnell with his prior convictions was the following:

> I don't know that I would have made any headway with this jury by making him [Mr. McConnell] a villain. He wasn't really going to our theory of the case, he was just a victim. I think he had some significant injuries and I didn't want to sit up there and pound my fist on the desk saying, you know, you're a convicted felon. I think the jury would have sort of held that against Mr. Manikowski and I in trying the case.

(Ex. S at 1411–12). Attorney Bollinger testified that he and Petitioner agreed that the best chance for an acquittal was to pursue the defense theory that someone else (specifically, Mark Borelli, who admitted he was in Petitioner's car at the time of the accident) was driving Petitioner's (*id.* at 1422–25). Attorney Bollinger testified that Mr. McConnell could not identify either the car or the driver that struck him and Mr. Reed; therefore, McConnell's testimony was not damaging to the defense in terms of undermining the defense theory presented at trial. Bollinger additionally testified that

Mr. McConnell's testimony was actually helpful to the defense in that McConnell admitted he had been drinking, admitted that he and Mr. Reed were in the roadway, and stated that he had tried to push Mr. Reed when he saw the headlights.

The record supports the state court's factual finding that Attorney Bollinger made a tactical decision not to pursue Mr. McConnell's prior felony convictions for impeachment. Additionally, the state court reasonably concluded that Bollinger's tactical decision was reasonable. Attorney Bollinger weighed the benefits and risks of using Kory McConnell's prior felony convictions as impeachment, and Bollinger reasonably concluded that there was little, if any, benefit to impeaching McConnell's credibility, and there was a risk that such impeachment (of a victim who was injured in the accident and saw his friend killed) would rub the jury the wrong way.

The state court's rejection of Petitioner's IATC claim was not based upon an unreasonable factual determination, and was not contrary to or an unreasonable application of <u>Strickland</u>. Petitioner is not entitled to relief on Ground Five.

> F. <u>Ground Six: "Defense counsel rendered ineffective assistance of counsel by failing to retain an independent accident reconstruction expert and failing to present the expert as a defense witness at trial."</u>

Petitioner asserts the State's theory at trial was that the driver of the vehicle caused the accident that killed Mr. Reed and injured Mr. McConnell (ECF No. 1 at

45–49).  Petitioner states he continues to maintain that he was not the driver.

Petitioner argues that defense counsel should have retained an accident reconstruction

expert to establish that it was the pedestrians/victims, not the driver, who caused the

accident by stepping in front of the oncoming vehicle.  Petitioner asserts that if

counsel had attempted to retain a reconstruction expert, the expert would have been

willing and available to testify at trial.  Petitioner states he presented this IATC claim

in his Rule 3.850 motion, and informed the state court that he had retained

reconstruction expert Donald J. Fournier, Jr.  Petitioner alleged that Mr. Fournier

reviewed the circumstances surrounding the accident and concluded that the

pedestrians caused the accident.

Petitioner states the post-conviction court denied this IATC claim without an

evidentiary hearing, on the basis that the focus of the defense was that Petitioner was

not the driver.  Petitioner contends that regardless of who was driving the vehicle at

the time of the accident, if the driver did not cause or contribute to the accident,

Petitioner could not be found guilty of DUI manslaughter.  Petitioner contends this

claim cannot be resolved without first hearing Mr. Fournier's testimony and opinion.

Petitioner requests an evidentiary hearing on this claim.

Respondent acknowledges that Petitioner raised a similar claim in state court (ECF No. 19 at 27).  Respondent contends Petitioner is not entitled to relief for several reasons.  First, Petitioner points to no case that holds that counsel's failure to hire an expert witness is deficient performance (*id.*).

Second, defense counsel chose a reasonable trial strategy of showing that Mr. Borelli, not Petitioner, was the driver of Petitioner's car (ECF No. 19 at 28).  Therefore, Petitioner cannot overcome the strong presumption that counsel provided constitutionally adequate assistance (*id.*).   Respondent argues that Attorney Bollinger's testimony at the evidentiary hearing showed that the jury was "upset" by Mr. McConnell's account of the accident, which is why Bollinger did not impeach McConnell with his prior felony convictions (*id.*).  It was thus reasonable to think that presenting expert testimony that the accident was the victims' fault may have a negative effect (*id.*).

Third, it is sheer speculation that the expert's testimony would have had any impact on the jury, especially since the defense was that Petitioner was not the driver (ECF No. 19 at 28).  The reconstruction expert's testimony would have been pitted against the eyewitness account given by Mr. Borelli, wherein Mr. Borelli testified he saw the pedestrians well in advance and warned Petitioner to slow down (*id.*).

Likewise, Ms. Caparelli, the taxicab driver who identified Mr. Borelli as the driver, testified that she was able to avoid hitting the victims even though they were in the roadway (*id.*). Therefore, there is no reasonable probability Petitioner would have been acquitted of DUI manslaughter (*id.*).

Fourth, the impact of a reconstruction expert's testimony would have been minimized by Kory McConnell's acknowledgment that he and Mr. Reed were in the road when they were struck (ECF No. 19 at 28).

Fifth, as the post-conviction court found, to prove DUI manslaughter the State need not necessarily prove causation, only that Petitioner contributed to the accident (ECF No. 19 at 28).

Sixth, even if an expert would have persuaded at least one juror that the accident was not Petitioner's fault, Petitioner would have been no better off, since the jury found him guilty of leaving the scene of an accident involving death, which exposed him to the same punishment as DUI manslaughter (ECF No. 19 at 28–29). Since the jury obviously believed that Petitioner was the driver, the reconstruction expert's testimony would have had no impact on the overall outcome of trial (*id.*).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 1 of his Second Amended Rule 3.850

motion (Ex. S at 732–33).  The state circuit court adjudicated the claim as follows:

> First, as to all of these claims the record demonstrates that Defense
> Counsel had to get this to trial rather quickly because there was concern
> that the Defense witness [Ms. Caparelli] was flying out to Europe soon
> and they did not want to lose her so they had to file a Notice of
> Expiration.  *See* Notice of Expiration of Speedy Trial filed 10/8/07;
> (Hearing Transcript 11/26/07 pgs. 11–12).  This witness was the taxi cab
> driver Defendant hit after running over the pedestrians who testified she
> saw the driver of Defendant's vehicle in the rearview mirror and she was
> certain it was not Defendant.  The State was sure to get on the record that
> with the Notice of Expiration being filed formal discovery had not been
> started or completed and that it was the Defendant's wishes.  (Hearing
> Transcript filed 3/5/08 of hearing held on 10/15/07 beg. pg. 45).
> Defense Counsel indicated that Defendant was aware and that he had
> asked that Defense Counsel file the Notice of Expiration. (pg. 46).
> Defense Counsel also asked Defendant if he had sufficient time to talk
> to Defense Counsel and Defendant said he had and Defendant also
> indicated he understood his defenses and the positive and negative
> aspects of his case (pg. 54) and indicated that he wanted to proceed to
> trial and the State had Defendant verify that he was satisfied with the
> services of both Defense Counsels [Attorney Bollinger and Attorney
> Anderson] (pgs. 54–55).  Thus, to the extent Defendant now argues
> counsel should have done this or that or spent more time on something
> it is clear that Defendant was well aware of the posture of the case at that
> time and that he wanted to file the Notice of Expiration and proceed to
> trial regardless.
>
> In **Ground 1** Defendant alleges counsel was ineffective in failing
> to retain an independent accident reconstruction expert and failing to
> present the expert as a defense witness at trial.  Specifically, Defendant
> asserts that the expert should have been retained to demonstrate that it

was the pedestrians, not the driver of the vehicle, who caused the accident in that the pedestrians stepped in front of the oncoming vehicle. Defendant indicates that the State's theory was that the driver of the vehicle caused the accident. Defendant notes that Defendant recently retained a reconstruction expert, Donald J. Fournier, Jr., who concluded the pedestrians caused the accident. However the Defendant notes that he continues to assert that he was not the driver of the vehicle but that if the driver of the vehicle did not cause the accident then there is no DUI Manslaughter offense regardless of who was driving the vehicle.

First, the Court would point out that the third element for DUI Manslaughter is that as a result of operating the vehicle Defendant caused or contributed to the cause of the death of the victim not just caused the death of the victim. (TT 10/18/07 Afternoon Session pg. 440). Second, it is very clear all throughout the transcript (*see* Ground 2 below), including argument and cross examination of State witnesses, that the focus of the defense in this trial was that Defendant was not the driver of the vehicle. It would not matter what the cause of the accident was if you are taking the position that Defendant was not the driver except to the extent you are arguing to the jury that in the alternative it was all the fault of the pedestrians that were run over and left for dead while the driver fled.

Additionally, there was no real dispute that the victims were in the road to some extent when the impact occurred. Defense Counsel elicited on cross examination from the surviving victim Kory McConnell, who was obviously present at the time of the accident, that he and the deceased victim were in fact in the middle of the lane when they were struck by Defendant's car. (TT 10/17/07 Afternoon Session pg. 152). Mr. McConnell explained that they had made it across the first lane, or the westbound lane, and were in the second lane, or eastbound lane when they were struck. (TT 10/17 /07 Afternoon Session pg. 151 ). Mr. McConnell testified that he looked for cars coming before they crossed the road and he saw no cars. (TT 10/17/07 Afternoon Session pg. 143). Then as they were crossing he heard the gunning or revving of the engine like a car kicking into passing gear and he turned to see the

headlights but it was too late. (TT 10/17/07 Afternoon Session pg. 144). Mark Borelli, the passenger in the vehicle whom Defendant claimed was driving, indicated on cross examination that although the pedestrian victims were not necessarily in the middle of the road they may have been inside the white line or inside the lane as opposed to on the side of the road. (TT 10/17 /07 Afternoon Session pgs. 111–112). Sgt. Danny McDonald concluded the victim pedestrians were just on the inside of the eastbound lane when they were struck, that there were no brake marks and no indication of evasive maneuvers taken by Defendant to avoid the pedestrians and Defendant was traveling at a speed somewhere between 34–66 mph in an area with a speed limit of 35mph. (TT 10/17 /07 Afternoon Session pg. 186, 188).

Mark Borelli, the passenger in Defendant's vehicle, testified it seemed like Defendant was driving a little fast, maybe a little over the speed limit. (TT 10/17 /07 Morning Session pg. 62). Mr. Borelli indicated that he first saw the two pedestrians when they were about 200 feet away from them. He warned Defendant to be careful of the pedestrians and slow down but Defendant did not respond at all by slowing down or swerving to avoid them and said nothing. Borelli then warned Defendant a second time prior to Defendant striking the pedestrians. Borelli testified that he saw the pedestrians in plenty of time and warned Defendant in plenty of time to avoid the pedestrians but it was like Defendant was not processing the information or had a slow reaction time. (TT 10/17 /07 Morning Session pgs. 64–66). After running over the pedestrians, Defendant hit a taxi cab and then fled the scene, leaving the victims for dead and without calling for help or notifying law enforcement.

Defendant's own witness, Ms. Caparelli, driver of the taxi cab Defendant hit after running over the pedestrians, indicated that when she pulled out of Coyote Ugly the pedestrian victims were crossing the road and that she was able to avoid them. (TT Afternoon Session 10/18/07 beg. pg. 381). Based on all of the above, the Court finds that the record demonstrates that even if Defendant had called an accident reconstructionist to say the accident was the pedestrians fault because

they stepped out into oncoming traffic, it would not have changed the outcome of the proceeding. The jury heard and there was no real dispute that the victims were crossing the road and that they were in the road to some extent. Based on the evidence in this case, testimony that the pedestrians stepped into oncoming traffic would not necessarily mean that Defendant driving drunk did not contribute to the cause of the victim's death. Thus, based on all of the above, Defendant's Ground 1 shall be denied.

(Ex. S at 779–81). The First DCA affirmed the decision without written opinion (Ex. X).

The state court record provides relevant factual background concerning Attorney Bollinger's representation of Petitioner. Petitioner was initially cited only with leaving the scene (*see* Ex. A at 1–5). Attorney Bollinger appeared on the case as retained counsel on April 25, 2007 (*id.* at 11). The Sate added the DUI manslaughter charge on May 29, 2007 (*id.* at 14–15, 19–20). The State provided witness statements, toxicology reports, medical examiner reports, and police reports throughout May, June, and July of 2017 (*id.* at 12–13, 21 25–29). Defense counsel hired a private investigator (*see id.* at 55). On September 2, 2007, Petitioner was arrested for violating the conditions of his pre-trial release, which created additional proceedings, including a first appearance and Attorney Bollinger's seeking a reduction of Petitioner's bond (*id.* at 32–50, 52–53). Also in September, Attorney Bollinger tended to a request by Petitioner's mother to seek return of Petitioner's vehicle, which

was seized as evidence, because she needed the vehicle for her own transportation (*id.* at 51). Also in September, defense counsel pursued critical pre-trial motions, including a motion to suppress evidence of Petitioner's blood-alcohol level, and a motion to dismiss three of the five counts, including the manslaughter count, on the ground that the State could not prove causation (because Mr. Reed and Mr. McConnell were in the roadway and did not have the right of way when they were struck by Petitioner's vehicle) (*id.* at 56–59). Attorney Bollinger filed a notice of expiration of speedy trial on October 8, 2007 (*id.* at 60), which was necessitated by a critical defense witness' plans to leave the country, and he made additional efforts to reduce Petitioner's bond (*id.* at 61–62). Jury selection occurred on October 15, 2007 (Ex. F), and trial commenced two days later (Exs. H, I, J, K).

Petitioner contends Attorney Bollinger was ineffective for failing to retain a reconstruction expert and present his testimony at trial. Petitioner states that prior to filing the post-conviction motion, he hired a reconstruction expert, Donald J. Fournier, Jr. Petitioner alleged in his Rule 3.850 motion that Mr. Fournier opined that it was the pedestrians—and not the driver of the vehicle—who caused the accident, i.e., the pedestrians stepped in front of the oncoming vehicle, thereby causing the accident (*see* Ex. W at 6).

Professionally competent assistance includes a duty to conduct a reasonable investigation.  *See* Strickland, 466 U.S. at 690–91.  Only when counsel's choices are made after a "thorough investigation of law and facts relevant to plausible options" are those choices "virtually unchallengeable."  *Id*. at 690.  When, however, "strategic choices [are] made after less than complete investigation [they] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Id*. at 690–91.  Thus, at bottom, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.   In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances. . . ."  *Id*. at 691.  This means that when a court assesses the attorney's decision not to investigate, it "must consider . . . whether the known evidence would lead a reasonable attorney to investigate further."  Wiggins v. Smith, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003).

It is clear from the trial transcript that Attorney Bollinger presented a primary defense theory that Mark Borelli, not Petitioner, was driving Petitioner's car at the time of the accident.  Defense counsel focused the jury's attention on this issue by presenting the testimony of Marissa Caparelli, who was working as a taxi cab driver

on the night of April 14, 2007 (*see* Ex. K at 370–86).  Ms. Caparelli testified that

shortly after 1:00 a.m. on April 14, 2007, she picked up three men at the Coyote Ugly

bar (*id.* at 372–73).  Ms. Caparelli testified that as she was creeping out of the parking

area to turn left or eastbound onto the road, she saw two men crossing the road and

approaching her on her left (*id.* at 372–73, 381–82).  Ms. Caparelli testified she

proceeded in front of the pedestrians so she would not hit them (*id.*).  Ms. Caparelli

testified that as she pulled her cab into the median area of the road, her cab was

bumped twice in the back by another car (*id.* at 372–73).

Ms. Caparelli stated that she pulled off the road and started to get out of her cab,

when a man ran to her and said that he thought a man was dead (Ex. K at 373–74).

Ms. Caparelli testified that she ran to the man who was hit and did not see any signs

of life, so she ran to a security officer at a nearby restaurant and told him that the man

was dead (*id.* at 374).  Ms. Caparelli did not see the car strike the man, but she looked

in her rearview mirror and saw the driver of the car (*id.*).  Ms. Caparelli described the

driver has having a dark complexion and dark eyes (*id.*).  She stated that the driver did

not look American (*id.*).  Ms. Caparelli testified that Officer Clarkson from the

Panama City Beach police department took her statement that night, but he never

asked her if she could identify the driver either in person or from photographs (*id.* at 374–75).

Ms. Caparelli testified that Attorney Bollinger's investigator showed her two photographs and asked if she recognized anyone (Ex. K at 375–76).  Ms. Caparelli testified that she picked the photograph of the person who was the driver of the car, and described him as "[t]he Italian-looking guy" (*id.* at 377).  The photograph was of Mark Borelli.  Ms. Caparelli testified that the eyes of the man who was driving and the eyes of the man in the picture were the same distinguishable eyes (*id.*).  Attorney Bollinger showed Ms. Caparelli another photograph (of Petitioner), and she testified that those were not eyes of the person driving the other car that night (*id.* at 377–78).  She stated, "He wasn't driving that night." (*id.* at 386).  When Attorney Bollinger asked Ms. Caparelli whether she had an interest in the outcome of Petitioner's trial, Ms. Caparelli answered, "Of course. . . . Justice." (*id.* at 372).

Attorney Bollinger also focused the jury's attention on the "Petitioner-was-not-the-driver" defense by developing testimony from the State's witnesses during cross-examination, suggesting that Mark Borelli was lying when he testified that Petitioner was driving.  Bollinger elicited testimony that Petitioner was very intoxicated on that night, and argued that it defied logic that Mr. Borelli would place himself in the

position of being Petitioner's passenger given Petitioner's state of intoxication.

Attorney Bollinger also showed Mr. Borelli the photograph of the man whom Ms.

Caparelli identified as the driver of Petitioner's car, and Borelli admitted that it was

him.  Attorney Bollinger also elicited testimony from Mr. Borelli that he was of Italian

descent.

It is obvious from the record that Attorney Bollinger was not only aware of the

causation defense, but he pursued it.  Under Florida's DUI manslaughter statute, the

State was required to prove that as a result of operating the vehicle, Petitioner caused

or contributed to causing the death of the victim.  *See* Fla. Stat. § 316.193(3).  "The

causation element of the amended statute was interpreted by [the Florida Supreme

Court] in [Magaw v. State, 537 So. 2d 564, 567 (Fla. 1989),] as not requiring that the

conduct of the operator of the vehicle be the sole cause."  State v. Hubbard, 751 So.

2d 552, 564 (Fla. 1999) (emphasis in original).  "The statute requires only that the

operation of the vehicle should have caused the accident.  Therefore, any deviation or

lack of care on the part of a driver under the influence to which the fatal accident can

be attributed will suffice."  Magaw, 537 So. 2d at 567.  Petitioner asserts the

reconstruction expert would have testified "that it was the pedestrians—and not the

driver of the vehicle—who caused the accident (i.e., the pedestrians stepped in front of the oncoming vehicle, thereby causing the accident)." (Ex. W at 6).

      Attorney Bollinger knew, pursuant to the probable cause affidavit filed with the court and the witness statements provided in discovery, that there was evidence that Mr. McConnell and Mr. Reed were crossing the roadway when they were struck by Petitioner's vehicle.  Defense counsel referenced this evidence in a pre-trial motion to dismiss (*see* Ex. A at 56–59).  But the probable cause affidavit and witness statements also included information that was not helpful to the defense on the causation issue.  One of the responding officers stated that the area of the roadway where the accident occurred was well-lighted.[3]  Additionally, Ms. Caparelli stated she was able to see and avoid hitting the same pedestrians immediately before Petitioner's vehicle bumped her cab.  Also, Mr. McConnell stated he heard a "revving" engine just prior to being struck.  And Mr. Borelli, who was in Petitioner's vehicle at the time of the accident, stated that he believed that Petitioner was driving a little fast; that he (Borelli) saw the pedestrians in sufficient time to stop if he had been driving; that he warned Petitioner about the pedestrians but Petitioner did not respond; and that

---

[3] Sergeant Jason Jones was dispatched to the scene of the accident at 1:48 a.m., and arrived at 1:50 (Ex. I at 152–54).  He described the lighting conditions at the scene as well-lit, including lighting from street lights, parking lots, and signs of several businesses (*id.* at 157).

Petitioner responded after Borelli's second warning, but Petitioner's reaction time was slow.[4]

As previously noted, defense counsel filed a pre-trial motion to dismiss the DUI manslaughter and DUI with injury charges, on the ground that there was not sufficient cause to believe that Petitioner's vehicle caused or contributed to the death of Mr. Reed or to the injury to Mr. McConnell because (1) Mr. Reed and Mr. McConnell were crossing the road in front of Petitioner's vehicle; (2) after walking onto the roadway, the men were allegedly struck by Petitioner's vehicle; (3) Mr. Reed and Mr. McConnell did not have the right of way on the roadway; and (4) Mr. Reed and Mr. McConnell violated the right of way (Ex. A at 56–59).

Defense counsel also pursued the lack of causation defense by focusing his cross-examination of Mr. McConnell on the fact that he and Mr. Reed were in the middle of the traveling lanes of traffic at the time they were struck (Ex. I at 149,

---

[4] Mr. Borelli stated that Petitioner seemed to be driving "a little fast" and the car was "revving a little bit," meaning, "getting a little fast and slowing down, speeding up a little bit" (Ex. H at 62–63). Mr. Borelli also stated that he first saw the pedestrians/victims when they were approximately 200 feet away (*id.* at 63). Borelli stated that when he first saw the pedestrians, he told Petitioner to "watch out, . . . there's someone on the side of the road" (*id.* at 64). Borelli stated that Petitioner did not respond to his warning (*id.*). Borelli stated he warned Petitioner a second time, telling him, "whoa, slow down, . . . there's people on the side of the road, . . . don't hit them, . . . watch what you're doing" (*id.* at 65). Borelli testified that Petitioner appeared to understand his second warning and then slowed down, but his reaction time was slow (*id.* at 66). Mr. Borelli testified that if he had been driving the car, he would not have hit the pedestrians, because there was plenty of time to move out of the way (*id.*).

151–52).  And defense counsel moved for a judgment of acquittal ("JOA") on grounds of lack of causation (Ex. K at 361–62).

Pursuing the "Petitioner-was-not-the-driver" defense as the primary defense theory was reasonable for several important reasons.  One, there was an unbiased eyewitness, Ms. Caparelli, whose testimony supported this defense theory and who was motivated only by the desire to see justice served.  Two, if the defense theory was successful, Petitioner would be absolved of all criminal liability for all five charges.  Three, the defense theory presented no risk of offending the jury or otherwise creating negative feelings toward the defense.

Retaining an accident reconstruction expert would have had little benefit.  Even if defense counsel had presented testimony of a reconstruction expert at the hearing on the motion to dismiss, there is no reasonable probability the court would have granted the motion due to the conflicting testimony of the parties' experts (one of the State's witnesses, Danny McDonald, was a traffic accident reconstruction expert (Ex. I at 169–94)).  And Petitioner still would have faced trial on a first degree felony, i.e., leaving the scene of an accident involving death.

Further, defense counsel's retaining a reconstruction expert and presenting his testimony would have had no effect on the trial court's denial of the motion for JOA.

In Florida, a motion for judgment of acquittal is properly denied "[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt." *See* Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). (citations omitted).  The trial court  denied the motion for JOA on the ground that the State presented sufficient evidence of causation despite the evidence that Mr. Reed and Mr. McConnell stepped into oncoming traffic (*see* Ex. K at 361–65 (relying upon Daigle v. State, 848 So. 2d 1233, 1234–35 (Fla. 2d DCA 2003) and Ackerman v. State, 737 So. 2d 1145, 1146–47 (Fla. 1st DCA 1999)).  Even if defense counsel had presented testimony from a reconstruction expert and then renewed a motion for JOA, there is no reasonable probability the trial court would have properly granted it, in light of the conflicting testimony of the State and defense reconstruction experts on the issue of causation, and the other evidence of the circumstances of the accident.  The ultimate issue of whether Petitioner caused the accident or contributed to Mr. Reed's death was a question for the jury.

Moreover, presenting testimony from a reconstruction expert would not have been without risk.  Testimony that Mr. Reed caused his own death had the potential to offend the jury and create negative feelings toward the defense.  *See* Hall v. State, 212 So. 3d 1001, 1018 (Fla. 2017) ("Trial counsel's decision not to present evidence

that could potentially be seen as advocating that [the victim] "deserved what she got" is certainly a reasonable strategic decision under norms of professional conduct."). By eliciting testimony on cross-examination from Mr. McConnell, the other victim, admitting that he and Mr. Reed were in the lane of traffic when they were struck, defense counsel was able to suggest that the victims bore blame, without having to assume any risk of backfire.

Fair-minded jurists could disagree as to the correctness of the state court's conclusion that defense counsel was not ineffective for failing to retain a reconstruction expert and present his testimony at trial, but it is this potential for disagreement which precludes a federal habeas court from granting relief. *See* Morris, 677 F.3d at 1127 (if, at minimum, fair-minded jurists could disagree about the correctness of the state court's decision, the state court's application of Supreme Court precedent was not unreasonable, and AEDPA precludes the grant of habeas relief.). Therefore, Petitioner is not entitled to relief on Ground Six.

> G.    Ground Seven:  "Defense counsel rendered ineffective assistance of counsel by failing to retain a toxicologist and failing to present the toxicologist as a defense witness at trial."

Petitioner contends defense counsel was ineffective for failing to retain a toxicologist and present his testimony at trial (ECF No. 1 at 49–51). Petitioner alleges

after trial, and prior to filing his Rule 3.850 motion, he retained toxicologist Dr. Lawrence Masten, who reviewed the case and concluded that Petitioner's blood-alcohol level was below .08 grams of alcohol per 100 milliliters of blood at the time of the accident. Petitioner contends the result of trial would have been different if counsel had retained a toxicologist and presented his testimony at trial.

Respondent asserts Petitioner raised a similar claim in state court (ECF No. 19 at 29). Respondent contends Petitioner did not proffer to the state court any details of Dr. Masten's "astounding assertion" that Petitioner's blood-alcohol level was below .08 despite the State toxicologist's testimony that Petitioner's blood-alcohol level was .229 to .231 (*id.* at 29–30).

Respondent additionally contends Petitioner's claim flies in the face of assertions the defense made at trial and in the Rule 3.850 motion, wherein Petitioner claimed that he was so intoxicated on the night of the accident that he never would have driven (*see* ECF No. 19 at 29). The defense used evidence of Petitioner's intoxication to argue that Mr. Borelli must have been driving Petitioner's car, and that Petitioner was so intoxicated that his statement to Mark Graham was subject to suppression. Respondent argues that defense counsel's performance can hardly be

deficient for failing to hire an expert to prove inconsistencies in the defense, especially when the defense was that Petitioner was not the driver.

Respondent also contends that a driver may be convicted of DUI even if his blood-alcohol level is below .08, provided that the State can show that the driver's "normal faculties [were] impaired," pursuant to Florida Statutes § 316.193(1)(a) (*see* ECF No. 19 at 29–30). Therefore, there is no guarantee that even if Dr. Masten had testified, the State would not have been able to prove impairment through its own toxicologist and eyewitness testimony of Petitioner's appearance and behavior within two to three hours after the accident.

Respondent makes a final argument that Petitioner's blood-alcohol level was immaterial to the charge of leaving the scene of a fatal accident (Count I) (ECF No. 19 at 30). Respondent acknowledges that the jury's verdict on that count was ultimately set aside because of double jeopardy concerns. But if the DUI manslaughter count went away, the jury's verdict on Count 1 would not have been set aside, and Petitioner would have been convicted and sentenced on that count which was also a first degree felony. Therefore, even if an expert witness had convinced jurors that Petitioner was not under the influence of alcohol, Petitioner would have faced the same punishment. For all these reasons, Respondent contends the state

court's decision not to hold an evidentiary hearing and to instead deny relief

summarily is not contrary to or an unreasonable application of <u>Strickland</u> or any other

authority, and was not unreasonable in light of the facts presented to the state court.

> 1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

> 2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 2 in his Second Amended Rule 3.850

motion (Ex. S at 733–35).  The state circuit court adjudicated the claim as follows:

> In **Ground 2**, Defendant alleges counsel was ineffective in failing
> to retain a toxicologist and failing to present the toxicologist as a defense
> witness at trial.  Defendant again denies driving the vehicle at the time
> of the accident.  However, regardless of who was driving, Defendant
> submits that he was not intoxicated at the time of the accident and thus
> could not be guilty of DUI Manslaughter even if he were driving.
> Defendant indicates that he recently retained toxicologist Dr. Lawrence
> Masten who has reviewed this case and concluded that Defendant [sic]
> blood alcohol level was below .08 grams of alcohol per 100 milliliters of
> blood at the time of the accident.
>
> Although Defense Counsel did move to have the blood results
> excluded based on improper handling of the blood samples, it was very
> clear from the record that the defense trial strategy before the jury was
> not to challenge the fact that Defendant was intoxicated.  It is also very
> clear all throughout the transcript, including argument and cross
> examination of State witnesses, that the main defense in this trial was
> that Defendant was not the driver of the vehicle.  It is also obvious that
> Defense Counsel was trying to use Defendant's intoxication level to their
> advantage to show that Defendant was so drunk that Mr. Borelli would

not have let Defendant drive so it must have been Mr. Borelli driving. In opening statements, Defense Counsel said, when asking the jury to pay attention to the testimony and ask themselves whether the elements are being met, "Now, the defendant, Mr. Manikowski, myself and Ms. Anderson may stipulate to some of those. For example, we may stipulate that, okay, the blood alcohol level was over a .08". In closing, Defense Counsel was arguing the fact that the State had not proved that Defendant drove or was in actual physical control of the vehicle and stated "If you can't satisfy that element beyond a reasonable doubt we don't care whether there was a death, we don't care if there was an injury, we don't care about his blood alcohol level. Bring it all in. Bring every photograph of that car you got because the State has not proved that Christopher William Manikowski was driving that car out in front of Coyote Ugly." Then Defense Counsel starts arguing conflicts in Mr. Borelli's testimony and says "He [Borelli] states Christopher Manikowski was not intoxicated yet the State's own witnesses tell you he was plastered, as Ms. Smith says, plastered. Why did I have his best friend [sic]? Why did I ask him, you're his best friend, right, you knew he was intoxicated, it is okay. I wanted him to tell me the truth. I wanted you to hear that he was plastered. Deputy Nick Hall, he feel[ sic] like a tree. Vicki Patrick, [Defendant] reeked of alcohol, he wasn't putting words in the correct form. He was plastered. But Mr. Borelli, he can't tell you that because it doesn't fit in his little story. Because remember what he told us? *He wouldn't get in a car with somebody that was plastered specifically* [sic] *asked him that question for that reason.* What about the woman who took the blood? Said he was belligerent and that he had a strong odor of alcohol. Remember me asking Mr. Borelli about a strong odor of alcohol? I don't know, I wasn't that close to him. Didn't fit in his little story. (emphasis added)."

Patrick Donohoe, long time friend of Defendant, testified that it was FSU Greek Weekend on Panama City Beach and that it was one big party and that he had seen Defendant doing shots that night and that he could tell Defendant was intoxicated. On cross examination, Defense Counsel reiterated that the witness had known Defendant for some time and that he would know when Defendant was intoxicated and when

Defendant was sober and confirmed that Defendant was intoxicated that night prior to this incident.

Diana Holmes saw Defendant's vehicle with the busted passenger windshield around 2:00 am just after the accident speeding through the State park revving the engine going the wrong way down the road.  Then she saw the vehicle come back and get stuck and she watched the driver push it free.  She was able to get the tag number and call it into the park ranger.  She did not get a good look at the driver and could not say for sure whether there was anyone else in the vehicle but she did not see anyone else and did not see the driver speak to anyone in the car and nobody else got out to help free the vehicle.

Nick Hall, a Sheriff's deputy, who was off-duty working security close by, heard the call over the radio about a drunk driver in the State park with a vehicle matching the description involved in the hit-and-run that had occurred minutes prior.  He was the first officer to encounter Defendant shortly after he fled the scene of the crime.  When Deputy Hall exited his vehicle and ordered Defendant to the ground Defendant began walking back towards the car and Defendant did not seem to understand what Deputy Hall was saying and when the Deputy ordered him to the ground again Defendant fell over face first like a tree and did not put his hands out to brace his fall.  Deputy Hall had to help him stand up and then Defendant was falling down so that Deputy Hall had to help Defendant walk to his patrol car.  He testified Defendant appeared to be under the influence of something, was very, very out of it and never said anything at all.  Deputy Hall said Defendant's eyes were glassy and appeared to be bloodshot. Officer Vicki Patrick arrived around 2:26 a.m. and she testified Defendant was highly intoxicated or "plastered."  She transported Defendant to the hospital for a blood draw. Officer Patrick testified Defendant was slurring, confusing words, had difficulty forming sentences and that he laid down and passed out.  She testified he had a strong odor of alcohol about him and that he was definitely intoxicated to the point that his normal faculties were impaired.  Devona Spalding, the phlebotomist who took Defendant's blood sample at the hospital said she remembered Defendant because he was really loud and belligerent.

She said Defendant's speech was slurred and real fast, he was cursing and he smelled of alcohol.  On cross, Defense Counsel re-confirmed the witness' testimony that Defendant was belligerent, that he was plastered and that he appeared to be under the influence and then asked if the phlebotomist had also taken a blood draw by a gentleman by the name of Mark Borelli that night and the phlebotomist responded that she did not recall having done so.  It should also be noted that prior to transport to the hospital Defendant gave a statement to ASA Mark Graham in which he misspelled his own name.

FDLE toxicologist David Blanchard testified that Defendant's blood alcohol level results were .229 and .231, over three times the legal limit.  The only questions on cross were whether the toxicologist received any blood samples from Mark Borelli and whether he conducted any analysis of Mark Borelli's blood to which the witness responded in the negative.  The only cross on the medical examiner, Dr. Siebert, was whether the photos showed who was driving the vehicle to which the medical examiner responded in the negative and whether he needed the autopsy photos to articulate the cause of death.  The only cross of Paul Blackburn, from DHSMV, who testified the vehicle was registered to Defendant was whether he had brought any papers that would tell who was driving the Defendant's vehicle in the early evening hours of April 14th 2007 to which he responded "no, ma'am."

On cross examination Defense Counsel elicited from Mr. Borelli that basically Defendant did not seem intoxicated and that Mr. Borelli himself was not completely sober and that Mr. Borelli does not drive a vehicle at all once he has had even a sip of an alcohol.  Then Defense Counsel confirmed again that Defendant did not appear to be plastered and that Mr. Borelli would not get into a vehicle with someone who was plastered.  Defense Counsel hammered Mr. Borelli for being dishonest about being involved in the accident when being confronted shortly after the accident by hotel security Corporal Bruhmuller who had been alerted when Mr. Borelli was overheard talking about the accident and repeatedly insinuated that it was because Mr. Borelli was the driver of that vehicle.  Then on recross Defense Counsel focused on the fact that

on redirect Mr. Borelli had identified a picture of the car as being a fair and accurate depiction of what it looked like when he got out of it and the fact that in that picture the car was in the sand. Defense Counsel insinuated this to mean that Mr. Borelli did not get out of the vehicle just after the pedestrians were run over as he testified but that if he recognized the vehicle as it was when it was stuck in the sand miles down the road at the State park where Defendant was found with the vehicle then that would corroborate the defense theory that Mr. Borelli had driven the vehicle down there and then called a friend to pick him up leaving only Defendant to be found with the car stuck in the sand.

There was overwhelming evidence that Defendant was highly intoxicated. The record demonstrates that instead of contesting Defendant's level of intoxication Defense Counsel was trying to use that evidence to put Mr. Borelli in the driver seat which would corroborate Ms. Caparelli, the taxi cab driver's, testimony that she saw the driver of Defendant's car in her rearview mirror and that it was Mr. Borelli driving and not the Defendant. Thus, the Court finds that the record makes it obvious that hiring a toxicologist to contest Defendant's level of intoxication would have completely gone against and undermined the Defense trial strategy. Further, the record demonstrates that this trial strategy was reasonable in light of the evidence as to Defendant's intoxication level prior to and just after the pedestrians were run over and the fact that Defendant had an eye witness who claimed it was not Defendant she saw driving in her rearview mirror but Mr. Borelli.

Generally, an evidentiary hearing is required before a court can determine that counsel's seemingly deficient performance was the result of a strategic choice. *Pomposello v. State*, 940 So. 2d 500, 501 (Fla. 5th DCA 2006) (citing *James v. State*, 881 So.2d 85 (Fla. 5th DCA 2004)). An exception to this general rule occurs when the reasonableness of counsel's strategy is obvious from the record. *Id.* at 502 (citing *State v. Williams*, 797 So. 2d 1235, 1239 (Fla. 2001), citing *McNeal v. Wainwright*, 722 F.2d 674, 676 (11th Cir. 1984)); *Harris v. State*, 768 So. 2d 1179 (Fla. 4th DCA 2000). The Court finds that this is one of those cases where the strategy is obvious from the record and that based

> on all of the evidence indicating Defendant was plastered and with a
> witness who was going to testify that she was certain it was not
> Defendant she saw in her rear view mirror that was driving such a
> strategy was reasonable. Thus, Ground 2 shall be denied based on all of
> the above.

(Ex. S at 781–84) (citations to state court record omitted). The First DCA affirmed

the decision without written opinion (Ex. X).

The state court's factual findings, with regard to the evidence adduced at trial,

is supported by the trial transcript. Based upon the evidence, the state court

reasonably concluded that defense counsel's failure to retain a toxicologist was

reasonable.

As previously discussed, in order to prevent the defense from losing its critical

witness, Ms. Caparelli, the case needed to move to trial quickly. The evidence

available to defense counsel during the four to five months available for investigation

and trial preparation was the following (based upon the testimony adduced at trial).

Law enforcement was dispatched to the scene of the accident at 1:48 a.m. (*see*

Ex. I at 152–54).

Diana Holmes was camping at St. Andrews State Park that night (Ex. I at

217–22). Ms. Holmes heard a vehicle making squealing sounds and revving the

engine, and saw the vehicle "coming the wrong way up the campground road very

quickly" (*id.* at 217–18). Ms. Holmes saw the driver stop, sit for "a little bit," and then continue on the campground road going the wrong way. A few minutes later, Ms. Holmes saw the vehicle come back on the campground road, make a quick left turn, and then get stuck in the sand. Ms. Holmes saw the driver get out of the car, walk to the front, and attempt to push the car out of the sand. Ms. Holmes did not see anyone else in the car. Ms. Holmes stated she contacted the park manager and the park ranger at approximately 2:00 a.m. Ms. Holmes described the vehicle as a black, two-door Infinity with a broken windshield on the passenger side. Ms. Holmes stated that the driver eventually freed the vehicle from the sand, and she recorded the license plate number.

Deputy Nick Hall testified that between 2:20–2:30 a.m., he located Petitioner and his car stuck in the sand in an area of the State Park (Ex. I at 224–38). Deputy Hall testified that the car matched the description of the car involved in the accident and the car observed in the campground. Deputy Hall testified that Petitioner was standing approximately 3–5 feet from the open driver's door. Hall testified that the car was running and in gear, and the passenger door was closed. Hall did not see anyone else in the area. Deputy Hall ordered Petitioner to the ground, and Petitioner immediately started to walk to his car. Hall again ordered Petitioner to the ground,

and Petitioner "fell straight over like if you chopped a tree," without making any attempt to brace his fall (*id.* at 230). Deputy Hall assisted Petitioner to his feet, helped him walk to the patrol car, and placed him in the car. Deputy Hall testified that Petitioner appeared to be under the influence of something, because he was "very, very out of it" (*id.* at 236). Deputy Hall testified that he did not notice an odor of alcohol on Petitioner, but Petitioner's eyes were glassy and "a little bloodshot" (*id.* at 237).

Deputy Vicki Patrick arrived at Deputy Hall's location at 2:26 a.m. (Ex. J at 243–63). Deputy Patrick moved Petitioner from Deputy Hall's patrol car to hers. She stated that Petitioner walked slowly and staggered. She described Petitioner as "plastered" and "highly intoxicated" (*id.* at 246). Deputy Patrick testified that she did not ask Petitioner any questions, but he volunteered the statement, "I didn't hit anybody" or "I didn't hurt anybody" (*id.* at 247).[5] Deputy Patrick stated that she noticed a very strong odor of alcohol, that Petitioner's speech was slurred, and he confused his words and had difficulty forming a sentence. Deputy Patrick stated that Petitioner laid down in the back seat of the patrol car and fell asleep or passed out.

---

[5] "Voluntary and spontaneous comments by an accused" are admissible evidence if the comments were not made in response to government interrogation. Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991); *see also* Miranda, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment. . . .").

Deputy Patrick testified that she transported Petitioner to the hospital to obtain a blood sample. She testified that as they were walking into the hospital, Petitioner stated, "I'm not going to alert on any test." (*id.* at 252).

Devona Spalding, a phlebotomist at the Gulf Coast Hospital, testified that she withdrew a sample of Petitioner's blood at 5:18 a.m. on April 14, 2007, using a kit provided by the Florida Department of Law Enforcement (Ex. J at 271–79). Ms. Spalding testified that she cleaned Petitioner's arm with a non-alcoholic Betadine swab, allowed the area to dry, and then used a vacutainer and two gray tubes (provided in the FDLE kit) to collect the blood. Ms. Spalding testified that Petitioner smelled of alcohol, was belligerent, and appeared to be under the influence of alcohol.

Michelle McDonald, a crime scene technician and evidence custodian, testified that she took custody of Petitioner's blood sample at 11:45 a.m. on April 14, 2007, and stored it in a refrigerator until April 23, 2007, when she sent it to the Florida Department of Law Enforcement ("FDLE") through FedEx overnight (Ex. J at 279–306).

David Blanchard, a crime lab analyst in the toxicology section of FDLE, testified that the FDLE crime lab received the blood sample on April 24, 2007, and stored it in a refrigerated vault (Ex. K at 342–49). Mr. Blanchard testified that the

gray tubes were significant in that they contained an anticoagulant and a preservative which prevents growth of micro-organisms in the sample. Mr. Blanchard testified that he did not observe any evidence of coagulation. He testified that he tested two separate portions of the samples using gas chromatography. Mr. Blanchard testified that on the first test he obtained a result of .231 grams of ethyl alcohol per 100 milliliters of blood, and on the second test he obtained a result of .229.

The state court reasonably concluded that defense counsel was not deficient for failing to retain an independent toxicologist. A reasonable defense attorney could have determined, from the evidence described above, that it was highly unlikely that a retained toxicologist would testify that Petitioner's blood-alcohol level was less than 0.08 at the time of the accident. Further, Petitioner did not proffer Dr. Masten's toxicology report to the state court, nor did Petitioner allege that defense counsel was aware of any circumstances that indicated a reason the FDLE's blood test results were not accurate and reliable indicators that Petitioner's blood-alcohol level was above .08 at the time of the accident.

Moreover, even if a toxicologist would have testified that Petitioner's blood-alcohol level was below .08 at the time of the accident, Petitioner still could have been found guilty of DUI manslaughter. To prove the second element of DUI

manslaughter, the State was required to prove that while driving the vehicle, Petitioner either (1) had a blood-alcohol level of .08 or more, or (2) was under the influence of alcoholic beverages to the extent that his normal faculties were impaired, or both.  *See* Fla. Standard Jury Instructions in Criminal Cases 7.8.  The term "normal faculties" includes the ability to see, hear, walk, talk, judge distances, drive an automobile, make judgments, act in emergencies and, in general, to normally perform the many mental and physical acts of daily life.  *Id.*  The term "impaired" means "diminished in some material aspect."  *Id.*

Additionally, Florida law Florida Statute § 316.1934 provides, in relevant part:

(2) At the trial of any civil or criminal action or proceeding arising out of acts alleged to have been committed by any person while driving, or in actual physical control of, a vehicle while under the influence of alcoholic beverages or controlled substances, when affected to the extent that the person's normal faculties were impaired or to the extent that he or she was deprived of full possession of his or her normal faculties, the results of any test administered in accordance with s. 316.1932 or s. 316.1933 and this section are admissible into evidence when otherwise admissible, and the amount of alcohol in the person's blood or breath at the time alleged, as shown by chemical analysis of the person's blood, or by chemical or physical test of the person's breath, gives rise to the following presumptions:

(a) If there was at that time a blood-alcohol level or breath-alcohol level of 0.05 or less, it is presumed that the person was not under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired.

(b) If there was at that time a blood-alcohol level or breath-alcohol level in excess of 0.05 but less than 0.08, that fact does not give rise to any presumption that the person was or was not under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired but may be considered with other competent evidence in determining whether the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired.

(c) If there was at that time a blood-alcohol level or breath-alcohol level of 0.08 or higher, that fact is prima facie evidence that the person was under the influence of alcoholic beverages to the extent that his or her normal faculties were impaired.  Moreover, such person who has a blood-alcohol level or breath-alcohol level of 0.08 or higher is guilty of driving, or being in actual physical control of, a motor vehicle, with an unlawful blood-alcohol level or breath-alcohol level.

Fla. Stat. § 316.1934(2).

In state court, Petitioner did not allege that Dr. Masten would have testified that Petitioner's blood-alcohol level was 0.05 or less at the time of the accident; instead, Petitioner alleged only that Dr. Masten would have testified that Petitioner's blood-alcohol level was less than 0.08.  In such a case, the jury would have been required to consider the test results with other competent evidence, in determining whether Petitioner was under the influence to the extent that his normal faculties were impaired.  Considering (1) the testimony of the law enforcement officers and medical personnel who had contact with Petitioner beginning just thirty to forty minutes after the accident, (2) the testimony that the area where the pedestrians were struck was

well-lighted, (3) Ms. Caparelli's testimony that she was able to see and avoid hitting the pedestrians, and (4) Mr. Borelli's testimony that he saw the pedestrians and twice warned Petitioner to slow down, but Petitioner was slow to respond, there was little chance a jury would find that Petitioner was <u>not</u> under the influence of alcohol to the extent that his normal faculties were impaired.

Moreover, as the state court determined, evidence that Petitioner's blood-alcohol level was less than 0.08 would have undermined the strong defense theory that Mr. Borelli was driving.  Ms. Caparelli was the only unbiased, disinterested witness who provided direct evidence of the identity of the driver of the car that night, and she identified Mr. Borelli as the driver.  The most convincing explanation for why Mr. Borelli was driving Petitioner's car was that Petitioner was too intoxicated to drive. And defense counsel used the evidence of Petitioner's intoxication to discredit Mr. Borelli's testimony that Petitioner did not appear to be intoxicated, and to show that Mr. Borelli fabricated his story/testimony to save his own skin.

Petitioner has not shown that no fair-minded jurist could have concluded, as the three-judge panel of the Florida First DCA did, that defense counsel was not deficient for failing to retain a toxicologist and present his testimony at trial.  Petitioner has not shown that the evidence on the deficient performance question is so one-sided in his

favor that the answer is, as the Supreme Court has phrased it, "beyond any possibility for fairminded disagreement." Harrington, 562 U.S. at 103.  He has not shown that the state court's rejection of his IATC claim was so unjustified that it "was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786–87; *accord* Bobby v. Dixon, 565 U.S. 24, 132 S. Ct. 26, 181 L. Ed. 2d 328 (2011) (per curiam); *see also* Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1258 (11th Cir. 2012).  Therefore, Petitioner is not entitled to federal habeas relief on Ground Seven.

> H.    Ground Eight:  "Defense counsel rendered ineffective assistance of counsel by failing to present mitigating evidence and/or request a downward departure/youthful offender sentence during the sentencing hearing."

Petitioner alleges the lowest permissible prison sentence set forth on his Criminal Punishment Code scoresheet was 138 months (ECF No. 1 at 51–54). Petitioner alleges defense counsel failed to present any statutory mitigating factors or request a downward departure sentence.  Petitioner contends defense counsel should have argued that Petitioner was entitled to a downward departure sentence pursuant to Florida Statutes § 921.0026(2)(j), which states that a court may impose a downward departure sentence if "[t]he offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse."  Petitioner

alleges he qualified for this mitigating factor.  Petitioner contends defense counsel also should have argued that he was entitled to a downward departure pursuant to Florida Statutes § 921.0026(2)(k), which states that a court may impose a downward departure sentence if "[a]t the time of the offense the defendant was too young to appreciate the consequences of the offense."  Petitioner alleges he was only twenty-years-old at the time of the accident, and that studies relied upon by the Supreme Court in Graham v. Florida, 560 U.S. 48 (2010) concerning sentences for juvenile offenders establish that the human brain is not fully developed until the age of twenty-four.  Petitioner contends defense counsel also should have requested that the trial court impose a youthful offender sentence, because Petitioner was eligible for such a sentence under Florida Statutes § 958.04.

Respondent acknowledges that Petitioner raised a similar claim in state court (ECF No. 19 at 30).  Respondent contends the state court's adjudication of the claim was not contrary to or a misapplication of clearly established federal law, and was not unreasonable in light of the facts adduced in state court (*id.* at 30–32).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 5 in his Second Amended Rule 3.850

motion (Ex. S at 739–42).  The state circuit court adjudicated the claim as follows:

> In **Ground 5** Defendant claims counsel was ineffective for failing
> to present mitigating evidence and/or request a downward departure or
> Youthful Offender sentence.  Defendant claims counsel should have
> requested a downward departure pursuant to 921.0026(2)0)[sic], Florida
> Statutes, because the offense was committed in an unsophisticated
> manner and was an isolated incident for which the defendant had shown
> remorse.  Defendant claims counsel also should have sought a downward
> departure pursuant to subsection (k) as well because at the time of the
> offense the Defendant was too young to appreciate the consequences of
> the offense.   Further, Defendant claims that counsel should have
> requested a Youthful Offender sentence for which Defendant was
> eligible at the time.
>
> On November 15, 2007, prior to sentencing, Defense Counsel filed
> in the record (Notice of Filing 11/15/07) nearly 100 pages of over 80
> character letters which the Court indicated were considered in
> sentencing.  (Sentencing Transcript 11/26/07).  The Court knew the
> scoresheet minimum was 138 months and proceeded to sentencing
> Defendant to 20 years prison followed by 10 years probation.  Based on
> Defendant's motion, Defendant still to this day denies being the driver
> of the vehicle.  Thus, it is not clear how it can possibly be argued that
> Defendant has or had accepted responsibility for his actions.  Defendant
> left these pedestrians for dead and did not call for help.  He fled.  As the
> Judge pointed out at sentencing had he stopped to help these people the
> exposure would have been something less.  Additionally, there was a full
> blown hearing on 10/18/10 on Defendant's Motion for Reduction of
> Sentence filed on 08/16/10.  As the State pointed out at the hearing, after
> this incident prior to sentencing Defendant had a number of warrants out
> on him for burglaries and thefts which resulted in his bond being
> revoked.  *See* Affidavit for Violation of Pretrial Release filed 9/12/07;
> Motion To Revoke Bond filed 9/11/07.  The motion seeking a reduction
> in sentence noted Defendant was eligible for Youthful Offender

sentencing and set forth various grounds for mitigation or reduction like those alleged in this motion. The motion was heard by the original sentencing Judge and the motion was denied. The Court made it clear that serious thought and consideration was put into the appropriate sentence for Defendant. The Court finds that it is clear from the record that mitigating factors were considered at sentencing and that had Defense Counsel asked for a departure sentence or Youthful Offender sentence at the time of sentencing that it would not have been granted and that it was considered and not granted upon the filing of the Fla. R. Crim. P. 3.800(c) motion. Thus, the record reflects that counsel's performance was not deficient and Defendant cannot demonstrate prejudice. Thus, Ground 5 is due to be denied.

(Ex. S at 786). The First DCA affirmed the decision without written opinion (Ex. X).

The state court records supports the state court's finding that Petitioner requested a youthful offender sentence in his Rule 3.800(c) motion (Ex. S at 396–97). The fact that the judge who rejected Petitioner's request was the same judge who sentenced him supports the state court's conclusion that Petitioner was not prejudiced by trial counsel's failure to request a youthful offender sentence at Petitioner's sentencing hearing.

With regard to counsel's failure to request a downward departure under § 921.0026(2)(j), which applies where "[t]he offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse," the state court reasonably concluded that, in light of Petitioner's continued insistence that he was not the driver and thus not responsible for killing Mr.

Reed and injuring Mr. McConnell, Attorney Bollinger was not deficient for failing to request a downward departure under that provision.

The same is true with regard to counsel's failure to request a downward departure under § 921.0026(2)(k), which applies where the offender is too young to appreciate the consequences of the offense. A defendant's youthful age alone will not justify a departure sentence. *See* <u>State v. Browne</u>, 187 So. 3d 377, 378 (Fla. 5th DCA 2016); <u>State v. Salgado</u>, 948 So. 2d 12 (Fla. 3d DCA 2006). "There must also be evidence that the defendant is emotionally immature or lacks ordinary intelligence." *Id.* at 15. "[T]he statute specifically requires that the defendant must also be *unable* to appreciate the consequences of the offense in order to be eligible for a downward departure." *Id.* at 16 (emphasis in original).

According to Petitioner's pre-sentence investigation report and his statements to Mark Graham, Petitioner was twenty-years-old and a junior at Florida State University majoring in business at the time of the accident (*see* ECF No. 19, Ex. C at 266–70; ECF No. 30, Ex. A at 3–4). Petitioner did not proffer any evidence suggesting he suffered from diminished mental capacity or other mental deficit which presented him from maturing enough by the age of twenty to appreciate the consequences of his conduct. Further, the fact that Petitioner drove away from the

scene after hitting two pedestrians and never returned indicates that was able to appreciate the consequences of his driving under influence and leaving the scene. Petitioner failed to show that Attorney Bollinger's failure to request a downward departure under § 921.0026(2)(k) was a decision that no competent counsel would make, and he failed to show a reasonable probability the trial court would have properly granted a downward departure if Attorney Bollinger had requested it. *See, e.g.*, <u>Browne</u>, 187 So. 3d at 378 (trial court erred in imposing downward departure sentence where there was no competent, substantial proof that defendant was too young to appreciate the consequences of his offenses); <u>State v. Leverett</u>, 44 So. 3d 634, 637 (Fla. 5th DCA 2010) (trial court's finding that defendant was too young to appreciate the consequences of his actions, as partial justification for its imposition of a downward departure sentence following defendant's conviction of home invasion robbery and other offenses, was not supported by competent, substantial evidence; defendant was 21-years-old at the time of the offense, and there was no evidence that he suffered from a mental defect inhibiting his ability to appreciate the consequences of his offenses); <u>State v. Salgado</u>, 948 So. 2d 12, 15–16 (Fla. 3d DCA 2006) (finding downward departure unwarranted where there was no evidence that the 21-year-old defendant was emotionally immature, lacked ordinary intelligence, or was otherwise

unable to appreciate the consequences of his offenses).  The state court reasonably concluded that defense counsel was not ineffective for failing to argue for a departure under § 921.0026(2)(k).

Petitioner failed to demonstrate that the state court's adjudication of this IATC claim was based upon an unreasonable determination of fact, or that it was contrary to or an unreasonable application of <u>Strickland</u>.  Petitioner is not entitled to relief on Ground Eight.

I.   <u>Ground Nine:  "Defense counsel rendered ineffective assistance of counsel by failing to object to the State's presentation of Dr. Charles Siebert's testimony at trial."</u>

Petitioner alleges Dr. Siebert, a medical examiner, testified and gave the jury his opinion regarding the cause of Mr. Reed's death (ECF No. 1 at 54–56).  Petitioner alleges the State introduced autopsy photographs of Mr. Reed through Dr. Siebert, even though Dr. Siebert did not perform the autopsy.  Petitioner contends Dr. Siebert's testimony constituted hearsay, i.e., hearsay testimony of Dr. Wilson Broussard, the doctor who performed the autopsy, as conveyed through Broussard's notes.  Petitioner contends defense counsel was ineffective for failing to object to Dr. Siebert's testimony as violative of Petitioner's rights under the Confrontation Clause.  Petitioner

contends the result of trial would have been different if counsel had asserted a Confrontation Clause objection.

Respondent acknowledges that Petitioner raised a similar claim in state court (ECF No. 19 at 32).  Respondent contends the state court's adjudication of the claim was not contrary to or a misapplication of clearly established federal law, and was not unreasonable in light of the facts adduced in state court (*id.* at 32–35).

  1.  Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

  2.  Federal Review of State Court Decision

Petitioner presented this claim as Ground 6 in his Second Amended Rule 3.850 motion (Ex. S at 742–43).  The state circuit court adjudicated the claim as follows:

> In **Ground 6** Defendant claims counsel was ineffective for failing to object to the State's presentation of Dr. Siebert's testimony at trial. Dr. Siebert was a medical examiner who testified and gave the jury his opinion regarding the cause of victim Harley Reed's death after reviewing the autopsy photographs and notes of Dr. Wilson Broussard who actually performed the autopsy.  Defendant claims Dr. Siebert's testimony was hearsay testimony of Dr. Broussard conveyed through Dr. Broussard's notes and admitted in violation of the Sixth Amendment Confrontation Clause as set forth by *Crawford v. Washington*, 541 U.S. 36 (2004).  Defendant claims that had counsel objected based on *Crawford* the State would not have been able to establish a cause of death and the prejudicial autopsy photographs would not have been admitted.

As Defendant notes, in *Crawford* the USSC held that when the prosecution offers evidence of out-of-court statements of a declarant who does not testify, and the statement constitutes "testimonial hearsay" the Confrontation Clause requires (1) that the declarant be unavailable and (2) a prior opportunity to cross-examine the declarant. *Crawford* at 51–69. However, Florida courts have held that autopsy reports are nontestimonial, and thus their admission at trial does not implicate a defendant's Sixth Amendment right of confrontation, because they are prepared pursuant to a statutory duty and not solely for use in prosecution. *See e.g., Banmah v. State*, 87 So. 3d 101 (Fla. 3d DCA 2012). Thus, Ground 6 is due to be denied.

(Ex. S at 786–87). The First DCA affirmed the decision without written opinion (Ex. X).

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The principal protection derived from the confrontation right is the right to effective cross-examination of the State's witnesses. *See* Crawford v. Washington, 541 U.S. 36, 61, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); United States v. Owens, 484 U.S. 554, 559, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

In State v. Belvin, 986 So. 2d 516 (Fla. 2008), the Florida Supreme Court reviewed the admissibility of forensic reports in light of Crawford. The state supreme

court concluded that the reports were testimonial, and their admission violated
Crawford because the right to confront the witness during a discovery deposition was
not a sufficient substitute for the right to confront a witness in court.  986 So. 2d at
524–25 (citations omitted).

In 2009, the United States Supreme Court concluded in Melendez–Diaz v.
Massachusetts, 557 U.S. 305, 310–11, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009), that
affidavits prepared by forensic technicians are testimonial under Crawford.  Therefore,
the defendant had the right under the Confrontation Clause to confront the analysts
who prepared the affidavits, absent (1) a finding that the analysts were unavailable,
and (2) the defendant's having had a prior opportunity to cross-examine them.  557
U.S. at 311.

The Florida Supreme Court subsequently distinguished both Belvin and
Melendez–Diaz, and approved of the testimony of a supervising witness who offered
her own opinion based on data generated by a team of analysts.  *See* Smith v. State,
28 So. 3d 838, 853–55, 855 n.12 (Fla. 2009).  The trial court in that case permitted an
FBI team supervisor to testify about her conclusion that a DNA sample matched the
known profile of the defendant.  *Id.* at 853.  The Florida Supreme Court explained that
unlike the experts in Belvin or Melendez–Diaz, the expert in Smith drew her own

conclusions from the raw data generated by several members of her team and—more importantly—testified during trial, where she was subject to cross-examination as to those conclusions.  28 So. 3d at 854–55.  Therefore, her testimony did not violate the Confrontation Clause.  *Id.*

Following Melendez–Diaz, the United States Supreme Court further elaborated on the admissibility of forensic laboratory reports in Bullcoming v. New Mexico, 564 U.S. 647, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011) and Williams v. Illinois, 567 U.S. 50, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012).  In Bullcoming, a majority of the Court held that a surrogate testifying witness could not be used to admit a forensic report written by a nontestifying technician.  564 U.S. at 663.  In that case, the original analyst who had performed a blood-alcohol content test was unexpectedly placed on unpaid leave on the eve of trial, but the prosecution did not claim that the analyst was unavailable.  *Id.* at 661–62.  In criticizing the use of testimony from a surrogate witness who did not offer an independent opinion, defense counsel was denied the opportunity to question the original analyst about the procedures used, or explore why the analyst had been placed on unpaid leave.  *Id.*  The Court concluded that testimony from the surrogate witness did not cure the underlying violation of Bullcoming's right under the Sixth Amendment to confront the original analyst.  *Id.* at 663.

In a concurring opinion, Justice Sotomayor emphasized the narrow scope of

Bullcoming:

> [T]his is not a case in which the person testifying is a supervisor,
> reviewer, or someone else with a personal, albeit limited, connection to
> the scientific test at issue. . . .  It would be a different case if, for
> example, a supervisor who observed an analyst conducting a test testified
> about the results or a report about such results. . . .
>
> . . . [T]his is not a case in which an expert witness was asked for his
> independent opinion about underlying testimonial reports that were not
> themselves admitted in evidence.  *See* Fed. Rule Evid. 703 (explaining
> that facts or data of a type upon which experts in the field would
> reasonably rely in forming an opinion need not be admissible in order for
> the expert's opinion based on the facts and data to be admitted). . . . We
> would face a different question if asked to determine the constitutionality
> of allowing an expert witness to discuss others' testimonial statements
> if the testimonial statements were not themselves admitted as evidence.
> . . . .
> This case does not present, and thus the Court's opinion does not
> address, any of these factual scenarios.

*Id.* at 672 (Sotomayor, J., concurring in part).  Four Justices dissented on the basis that

they concluded that the evidence was not testimonial under the Confrontation Clause.

*Id.* at 674–84 (Kennedy, J., dissenting).

In Williams, a plurality of the Supreme Court concluded that an expert witness

could offer an opinion about a forensic report without ultimately testifying to the

underlying truth of that report.  567 U.S. at 57–58.  The report itself was prepared by

a nontestifying witness, but was not admitted.  *Id.*  The plurality, written by Justice

Alito and joined by Chief Justice Roberts and Justices Kennedy and Breyer, further held that the report itself would not have violated the Confrontation Clause, even if it had been admitted. *Id.* at 2242. The plurality concluded that the report was not testimonial because it was generated at a time when a dangerous, unknown rapist was at large. *Id.* at 2243–44 (citation omitted). Justice Thomas concurred in the judgment on the basis that the evidence was admissible "solely because [the report] lacked the requisite 'formality and solemnity' to be considered 'testimonial' for the purposes of the Confrontation Clause." *Id.* at 103 (Thomas, J., concurring in the judgment) (citation omitted).

The Florida Supreme Court recently considered whether a substitute forensic technician, specifically a medical examiner, may testify in the wake of Melendez–Diaz, Bullcoming, and Williams. *See* Calloway v. State, 210 So. 3d 1160 (Fla. 2017). In Calloway, the trial court allowed Dr. Hyma to testify in the place of Dr. Siebert with regard to the causes of death and injuries to the victims. 210 So. 3d at 1192. Dr. Siebert was the medical examiner who performed the autopsies, but moved to another part of the State by the time of trial. *Id.* Before and during trial, defense counsel objected that the State had failed to demonstrate that Dr. Siebert was unavailable, in violation of Crawford. *Id.* Without expressly concluding that Dr.

Siebert was unavailable, the trial court ruled that Dr. Hyma could offer his own

opinion and be subject to cross-examination during trial. *Id.* Dr. Hyma testified that

he reviewed photographs and a descriptive narrative taken from the crime scene; body

diagrams and sketches; police records; medical records; and Dr. Siebert's autopsy

reports to prepare his opinion regarding the causes of death. *Id.* He testified that Dr.

Siebert was part of the investigative team that responded to the crime scene in 1997,

and a homicide officer likely attended the autopsies conducted by Dr. Siebert. *Id.*

During redirect examination, Dr. Hyma confirmed that he developed his own

objective findings regarding the causes of death and stated that he primarily relied on

photographs taken from the scene. *Id.*

The Florida Supreme Court held:

> Despite the lack of a clear majority opinion in Williams, the factual
> similarities between this case and Williams, as well as our decision in
> Smith, lead us to conclude that the surrogate testimony of Dr. Hyma did
> not violate Calloway's rights under the Confrontation Clause. First, Dr.
> Hyma was available during trial to testify and was subject to
> cross-examination. *See* Smith, 28 So.3d at 853–55, 855 n.12. Second,
> unlike in Bullcoming, the autopsy reports of Dr. Siebert were not
> admitted through the testimony of Dr. Hyma. *See* Williams, 132 S. Ct.
> at 2238–40 (plurality opinion) (finding no Confrontation Clause
> violation in the admission of an expert opinion that relies upon data not
> directly in evidence); Bullcoming, 564 U.S. at 668, 131 S. Ct. 2705
> (Sotomayor, J., concurring in part). Instead, Dr. Hyma clearly explained
> to the jury that his independent opinion was derived from the
> photographs taken by investigators at the scene and from Dr. Siebert's

> autopsy reports.  It was this independent opinion that was available during trial and subject to cross-examination.  *See* Smith, 28 So. 3d at 853–55.  Although the expert in Smith supervised several analysts, both the expert in Smith and Dr. Hyma testified that they drew their own independent conclusions.  *See id.*  Therefore, Calloway was afforded the in-court opportunity to cross-examine the State's expert about the causes of death, and no violation of the Confrontation Clause occurred.

210 So. 3d at 1195.

Here, Dr. Siebert testified that he was not the medical examiner who performed the autopsy on Mr. Reed, and that Dr. Wilson Broussard had performed it (Ex. K at 350–356).  Dr. Siebert testified that he had access to the records and photographs of Dr. Broussard's autopsy, and that he was the records custodian for the autopsies performed in Bay County, Florida.  Dr. Siebert testified that he had an opportunity to review the notes and photographs of the autopsy performed on Mr. Reed, and based upon the notes and photographs that he reviewed, he formed an opinion concerning Mr. Reed's cause of death.  When asked what that opinion was, Dr. Siebert testified, "The cause of death as listed on the report in the death is blunt force cranial cerebral trauma, in other words, blunt head trauma." (*id.* at 351–52).  Dr. Siebert then used the autopsy photographs to explain Mr. Reed's injuries and how the injuries caused his death (*id.* at 352–56).  The photographs were admitted into evidence (*id.* at 352).  The autopsy report itself was not admitted into evidence (*see* Ex. A at 103–05).

As demonstrated by the development of the law since Petitioner's trial in

October of 2007, admission of Dr. Siebert's opinion testimony (i.e., that the cause of

Mr. Reed's death was blunt head trauma), did not violate Petitioner's rights under the

Confrontation Clause.    Therefore, defense counsel's failure to object was not

ineffective.    The state court's adjudication of Petitioner's IATC claim was not

contrary to or an unreasonable application of Strickland.    Accordingly, Petitioner is

not entitled to federal habeas relief on Ground Nine.

> J.    Ground Ten:   "Defense counsel rendered ineffective assistance of
> counsel by failing to properly impeach Mark Borelli and by failing to
> effectively point out Mr. Borelli's inconsistent statements during counsel's
> closing argument."

Petitioner alleges Mr. Borelli was the State's key witness (ECF No. 1 at 56–58).

Petitioner alleges the State's theory of the case was that Mr. Borelli was a passenger

in the vehicle (based on Mr. Borelli's testimony), but Petitioner's contention was (and

is) that Mr. Borelli was driving (as confirmed by Marisa Caparelli, the driver of the

taxicab that was struck by Petitioner's car after the pedestrians were struck).

Petitioner contends it was thus necessary for the defense to impeach Mr. Borelli.

Petitioner contends defense counsel failed to properly impeach Mr. Borelli and failed

to effectively point out Mr. Borelli's inconsistent statements during counsel's closing

argument.    For example, (1) during his pretrial statements, Mr. Borelli gave

inconsistent times regarding when he met Petitioner, and (2) during his pretrial statements, Mr. Borelli said that the other vehicle that was hit during the incident was "a white car, maybe gray, tan, white," but then during the trial he said that he never saw the car because the windshield on the passenger side was cracked.  Petitioner argues that defense counsel should have questioned/impeached Mr. Borelli regarding these inconsistent statements.  Petitioner also contends defense counsel should have focused on these inconsistencies, as well as others, during closing arguement, to convince the jury that Mr. Borelli was not a credible witness.

Petitioner additionally contends that during the trial, Mr. Borelli stated that he did not call anyone after the accident.  However, Petitioner's post-trial investigation of Mr. Borelli's cell phone records demonstrates that Mr. Borelli did, in fact, make phone calls after the accident (ECF No. 1 at 57).  Petitioner contends defense counsel should have investigated Mr. Borelli's cell phone records prior to trial then could have used the records to impeach Mr. Borelli's testimony.

Respondent acknowledges that Petitioner raised a similar claim in state court (ECF No. 19 at 35).  Respondent contends the state court's adjudication of the claim was not contrary to or a misapplication of clearly established federal law, and was not unreasonable in light of the facts adduced in state court (*id.* at 35–36).

1.    Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

2.    Federal Review of State Court Decision

Petitioner presented this claim as Ground 7 in his Second Amended Rule 3.850

motion (Ex. S at 744–45).  The state circuit court adjudicated the claim as follows:

> In **Ground 7** Defendant claims counsel was ineffective for failing
> to properly impeach Mark Borelli and failing to effectively point out Mr.
> Borelli's inconsistent statements during counsel's closing arguments.
> Defendant indicates that Mr. Borelli was the State's key witness because
> the State's theory, based on Mr. Borelli's testimony, was that Mr. Borelli
> was a passenger in the vehicle Defendant was driving.  However,
> Defendant notes that he maintained then and still does now that Mr.
> Borelli was driving not the Defendant and that this was confirmed by the
> taxi driver Ms. Caparelli.  Thus, Defendant maintains it was key to
> impeach Mr. Borelli and point out his inconsistent statements.
>
> At trial Ms. Caparelli did testify that she could see the driver of the
> vehicle in her rearview mirror that struck the cab she was driving and
> that it was not the Defendant.  She testified the driver had a dark
> complexion and dark eyes and did not look American but instead was
> foreign looking or in other words matched the description of Mr. Borelli
> which supported Defendant's theory of the case.  She also indicated that
> she viewed a lineup of only Defendant and Mr. Borelli and that based on
> this lineup of two people it was Borelli driving.  However, she claims to
> have been able to identify the driver solely by his eyes and eyebrows that
> she saw in the rearview mirror.  She also testified that she first thought
> the driver was wearing a baseball hat but then admitted it was probably
> one of the three passengers in her cab she had seen.  In other words, she
> basically admitted to first mistakenly describing a passenger in her
> vehicle thinking it was the driver of Defendant's car she had seen in the
> rearview mirror.  Regardless, she did testify that from what she had seen

she was certain Defendant was not the driver.  Obviously the jury did not buy her testimony.

As examples of inconsistencies Defendant points out that (1) during his pretrial statements, Mr. Borelli gave inconsistent times regarding when he met the Defendant and (2) during his pretrial statements, Mr. Borelli said the other vehicle that was hit during the incident was "a white, maybe gray, tan, white," but during trial he said he never saw the car because the windshield on the passenger side was cracked.  At trial Defense Counsel asked Mr. Borelli what time it was when Mr. Borelli met the Defendant to which he responded "I'm not sure, I wasn't really keeping track of time."  Thus, it is not clear what there was to impeach when Mr. Borelli indicated he was not sure. During his pretrial statement when asked what time he met Defendant, Borelli responded "Um, maybe 2-ish, 1:30-ish, 2".  The officer explained he had received a call about the accident around 1:45 a.m. so it must have been prior to that and Borelli responded "Earlier, maybe 1:15, 1:20".  Mr. Borelli explained that he had met Defendant not long before getting in the car with him and spent at most 15–20 minutes total with Defendant, all of which is consistent with Borelli's trial testimony.

Additionally, Mr. Borelli's pretrial statement, when asked about "what kind of car" Defendant hit after striking the pedestrians, was "I am not sure, I know it was, it was a white car, maybe gray, tan, white." This statement makes it pretty clear that he really did not know what kind of car it was but thought maybe he had an idea of what color it might be and was obviously not too sure about that either.  At trial the following exchange occurred:

ASA:  So after he hit a person, he hit another vehicle?

Borelli:  Yes

ASA:  Were you able to see that car?

Borelli:  Not out of my, not out of the windshield anymore, no.

ASA:  Because it was cracked?

Borelli: Yes

The pretrial comment might have been based on a glimpse Mr. Borelli caught of the vehicle in front of them just before the pedestrian was hit and the windshield was cracked.  Regardless, the bottom line is pretrial when [he] was asked what kind of car it was [he] said he was not sure and he said nothing about the make or model but follows it up with a vague description of the color which verifies that he was in fact not even sure about that.  In other words, this is certainly not some significant inconsistency with his trial testimony.

In Footnote 18 on page 18 of Defendant's Motion Defendant points to additional inconsistencies in Mr. Borelli's trial testimony that Defendant claims counsel should have addressed in closing arguments such as (1) whether the driver of the vehicle slammed on the brakes; (2) the speed of the vehicle; and (3) whether Defendant appeared intoxicated (i.e., Mr. Borelli claimed that Defendant did not appear intoxicated, yet he claimed that the Defendant's reaction time was slow).

As to whether Defendant slammed on the brakes, there was testimony from Mr. Borelli at trial on direct and cross-examination, including impeachment that brought out his pretrial statements, that Borelli felt like Defendant slowed down or slammed on the brakes at the point of impact.  Mr. Borelli then also indicated on cross that he felt like Defendant slammed on the brakes but there was no noise or screeching sound and that it could have just been the impact of the body that he felt. Sgt. Danny McDonald concluded that there was no evidence of brake marks and no indication of evasive maneuvers taken by Defendant to avoid the pedestrians at the scene.  The record demonstrates that there was no significant inconsistency that was not brought out that any further focus on in closing argument would have changed the outcome of a proceeding.

As to the inconsistencies in Mr. Borelli's testimony as to whether Defendant appeared intoxicated, the record demonstrates there were really no inconsistencies within Borelli's own testimony as to Defendant's level of intoxication.    The issue was more the inconsistencies between Mr. Borelli's testimony and all the other State witnesses regarding Defendant's apparent level of intoxication.  Mr. Borelli's testimony was basically that in those minutes he was with Defendant he did not notice any major signs of intoxication but then Defendant was not responding when Mr. Borelli was telling Defendant to watch out for the pedestrians and to slow down.   The other State witnesses' testimony was that Defendant was highly intoxicated or plastered.  Defense Counsel argued in closing that Mr. Borelli denying seeing signs that Defendant was intoxicated was Mr. Borelli lying to support his "story" that he was a passenger and that Defendant was the driver.  It was the defense theory that if Mr. Borelli acknowledged that Defendant was drunk then the jury would question why Mr. Borelli had gotten into the vehicle as a passenger and not driven himself.  However, the Court would note that another explanation for Mr. Borelli's testimony is that Mr. Borelli really did not know Defendant was so drunk.  It is clear that Mr. Borelli met Defendant just minutes prior to getting in Defendant's vehicle and that Mr. Borelli was only riding in the vehicle for a matter of minutes prior to Defendant running over the pedestrians.  Mr. Borelli did not really know Defendant and had not been around him long at all before Defendant struck the pedestrians. Regardless, it is clear from the record that Defense Counsel was calling Mr. Borelli a liar as to his testimony regarding Defendant's level of intoxication and that anything further on this issue would not have changed the outcome of the proceeding.

As to the speed of the vehicle, at trial on direct examination Mr. Borelli, when asked how Defendant was driving, testified "not like recklessly or anything, but seemed kind of maybe a little fast, maybe a little over the speed limit . . . just like the car, maybe it was revving a little bit, nothing too, you know, out of line, no . . ."   On cross examination Mr. Borelli indicated Defendant was driving maybe 40–45 mph when they were coming back down Front Beach road prior to the

accident.  Defense Counsel then impeached [him] with his pretrial statement where [he] said "30, 35, 40" mph and Mr. Borelli clarified that was his response when asked how fast he thought Defendant was going when he hit the victims.  Then Defense Counsel points out that Mr. Borelli then says "20" mph in his pretrial statement and Mr. Borelli explained that the 20 mph was when Defendant was hitting the brakes. Then Defense Counsel makes a big point that Mr. Borelli's testimony is changing as to mph and asks him again how fast Defendant was going down front beach road to which Mr. Borelli replies "about 35, 35, 40". In response Defense Counsel asked Mr. Borelli if Defense Counsel needed to refresh Mr. Borelli's memory as to his testimony earlier that day in response to which the State objected.  Then Defense Counsel asked him again how fast Defendant was going and he said "I'm not real sure, I mean, approximately, I wasn't really looking at the, at the speedometer, maybe approximately 35 or 40."  It should also be noted that Sgt. McDonald estimated that Defendant was traveling at a speed somewhere between 34–66 mph in an area with a speed limit of 35mph. The record demonstrates that Defense Counsel made it very clear to the jury that Mr. Borelli was not exactly sure as to Defendant's speed and Mr. Borelli testified himself that he was not real sure.  Most people who ride in a vehicle are not able to identify the exact speed the vehicle is going without looking at the speedometer and once [Mr. Borelli] acknowledged that he was not sure after being impeached the point was made and the record demonstrates that any further emphasis in closing argument would not have changed the outcome of the proceeding.

Also, Defendant claims that during the trial Mr. Borelli stated he did not call anyone after the accident.  However, Defendant notes that his recent investigation of cell phone records reveals that Mr. Borelli did in fact make two calls around the time of the accident, one at 1:46 a.m. and one at 2:23 a.m.  Defendant claims counsel should have used these cell phone records to impeach Mr. Borelli.  However, at trial it was clear from Mr. Borelli's testimony he was not sure whether he called someone or not so it is not clear how Defense Counsel could really have impeached Mr. Borelli based on the cell phone records but if he had it is obvious from the record that it would not have been effective or changed

the outcome of the proceeding.   The following exchange occurred
between Defense Counsel and Borelli:

Q:  You didn't call anyone, did you?

A:  No.

Q:  Are you sure about that?

A:  I might have called a friend.

Q:  Who did you call?

A:  I'm not sure.

Q:  Well, then why do you say you might have called a
friend?

A:  Well, I was really freaked out, shocked, so I might have
called someone,  I don't remember exactly or if I even did.

Q:  Did you call your father?

A:  No.

Q:  Did you call anybody?

A:  No.

Q:  But you didn't call law enforcement, did you?

A:  No.

Therefore, Mr. Borelli explained that he did not think he had
called anyone but maybe he had because he could not remember due to
being freaked out and shocked.

      Further, Defense Counsel spent a large part of closing arguments pointing out conflicts in Mr. Borelli's testimony. The Court finds that the claims raised in Ground 7 basically amount to what can best be described as Monday morning quarterbacking and the attached record demonstrates that either there was not really an inconsistency or if there was it was insignificant and/or sufficiently dealt with by Defense Counsel so that it is obvious from the record that as to these claims Defense Counsel's performance was not deficient and/or Defendant did not suffer prejudice as required by *Strickland*. Thus, Ground 7 shall be denied.

(Ex. S at 787–90) (citations to state court record omitted). The First DCA affirmed the decision without written opinion (Ex. X).

All of the state court's factual findings with respect to trial testimony, Mr. Borelli's pre-trial statements, and defense counsel's performance at trial, are reasonable in light of the state court record. Considering these facts, the state court reasonably concluded that defense counsel was not ineffective with respect to the cross-examination of Mr. Borelli, and defense counsel's closing argument regarding Mr. Borelli's credibility. Additionally, the state court reasonably concluded that defense counsel's failure to investigate Borelli's phone records was not ineffective. Petitioner is not entitled to federal habeas relief on Ground Ten.

    K.   <u>Ground Eleven:  "The cumulative effect of defense counsel's errors deprived Petitioner Manikowski of a fair trial."</u>

Petitioner contends all of the alleged errors committed by defense counsel, considered either individually or together, resulted in Petitioner's being denied a fair trial (ECF No. 1 at 58).

Respondent acknowledges that Petitioner raised a similar claim in state court (ECF No. 19 at 36).  Respondent contends the Supreme Court has not recognized the cumulative effect doctrine in the context of ineffective assistance of counsel claims (*id.*).  Moreover, even if Petitioner's cumulative error claim is considered, he has not satisfied the AEDPA's deferential standards, because none of Petitioner's claims bundled into one satisfied both prongs of <u>Strickland</u> (*id.* at 36–37).

Petitioner presented a "cumulative error" claim as Ground 9 of his Second Amended Rule 3.850 motion (Ex. S at 747).  The state court summarily denied the claim without explanation (*id.* at 1401).  The First DCA affirmed the decision (Ex. X).

In rejecting a similar "cumulative error" argument made by a § 2254 habeas petitioner, the Eleventh Circuit stated:  "The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim."  <u>Forrest v. Fla. Dep't of Corr.</u>, 342 F. App'x 560, 564 (11th Cir. 2009) (per curiam) (unpublished but recognized for persuasive authority).  The <u>Forrest</u> panel further noted "[h]owever, the Supreme Court has held, in the

context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" *Id.* at 564–65 (quoting United States v. Cronic, 466 U.S. 648, 659 n. 26, 104 S. Ct. 2039, 80 L .Ed. 2d 657 (1984)).

In light of Cronic and the absence of Supreme Court precedent applying the cumulative error doctrine to claims of ineffective assistance of counsel, the state court's rejection of Petitioner's claim is not contrary to or an unreasonable application of clearly established federal law. *See* Wright v. Van Patten, 552 U.S. 120, 126, 128 S. Ct. 743, 169 L. Ed. 2d 583 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established federal law."); Schriro v. Landrigan, 550 U.S. 465, 478, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007) (The Arizona Supreme Court did not unreasonably apply federal law because "we have never addressed a situation like this."); Reese v. Sec'y, Fla. Dep't of Corr., 675 F.3d 1277, 1287–88 (11th Cir. 2012) ("The Supreme Court has reiterated, time and again, that, in the absence of a clear answer—that is, a holding by the Supreme Court—about an issue of federal law, we cannot say that a decision of a state court about that

unsettled issue was an unreasonable application of clearly established federal law.");

*see also* <u>Morris</u>, 677 F.3d at 1132 (refusing to decide whether, under the current state of Supreme Court precedent, cumulative error claims reviewed through the lens of AEDPA can ever succeed in showing that the state court's decision on the merits was contrary to or an unreasonable application of clearly established law).

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  28 U.S.C. § 2254 Rule 11(a).  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate

to deserve encouragement to proceed further.'" <u>Buck v. Davis</u>, 580 U.S.—, 137 S. Ct. 773 (2017) (citing <u>Miller-El</u>, 537 U.S. at 327).  The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.     That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.     That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this <u>10</u>th day of May 2018.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.